**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NLMK PENNSYLVANIA, LLC and NLMK INDIANA, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES STEEL CORPORATION, <br><br> *Defendant*. | C.A. No. 2:21-cv-273 <br><br> (Removal from: The Court of Common Pleas of Allegheny County, GD-21-000719) <br><br> Electronically Filed |

## NOTICE OF REMOVAL

The U.S. arm of Russian steel conglomerate NLMK brought this case in an attempt to intimidate and silence the American steel industry, collaterally attack the decisions and authority of the United States Department of Commerce ("Commerce"), and re-litigate Commerce's interpretation and application of a Presidential Proclamation imposing tariffs to protect the national security of the United States. This case implicates significant federal interests, involves substantial federal questions and defenses, and should be litigated in federal court.

At heart, NLMK's suit is based on NLMK's disagreement with Commerce's application of tariffs, and Commerce's administration of a federal program to evaluate tariff exclusion requests. NLMK was not satisfied with the results of these federal proceedings. NLMK then sued Commerce in the Court of International Trade. *See NLMK v. United States*, Case No. 20-00050, Dkt. 63 (C.I.T. Nov. 12, 2020). NLMK now attempts a third bite at the apple by alleging that United States Steel Corporation ("U. S. Steel") *caused* Commerce to deny NLMK's tariff exclusion requests when U. S. Steel, pursuant to Commerce's own regulations and guidance, participated in the federal administrative process. *See, e.g.,* Ex. 1.A ¶¶ 8; 19-20; 41-44; 49; 59-60; 64; 67; 90 ("Complaint").

The President of the United States imposed these tariffs on NLMK's (and other similarly situated) steel imports via a Presidential Proclamation under Section 232 of the Trade Expansion Act, which authorizes the President to "adjust the imports" if the President determines that the "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security."  19 U.S.C. § 1862.  Relying on national security authority, and having considered recommendations from the Secretary of Commerce, the President established a 25% ad valorem tariff on steel in 2018.  Presidential Proclamation 9705 of March 8, 2018, "Adjusting Imports of Steel Into the United States," 83 Fed. Reg. 11625, ¶¶ 2, 8 ("Proclamation 9705").

At the same time, the President "authorized"—but did not require—the Secretary of Commerce, "in consultation with" senior officials including "the Secretary of State, the Secretary of the Treasury, [and] the Secretary of Defense," to provide relief from the tariffs "for any steel article determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality" or for "specific national security considerations." Proclamation 9705 § 3.  In response, Commerce created an administrative process for requesting exclusions from the Section 232 tariffs, as well as a procedure that encouraged private steel producers to provide relevant information needed to evaluate exclusion requests.  *See* 83 Fed. Reg. 12106 (Mar. 19, 2018).

NLMK made extensive use of this federal administrative process.  According to NLMK's complaint, "Between 2018 and the present, NLMK submitted 162 requests for exclusions from the Section 232 tariffs for semi-finished steel slab."  Compl. ¶ 13.  Following federal regulations, U. S. Steel (and other domestic producers) filed objections to NLMK's exclusion requests and provided *truthful and accurate* information to Commerce about its domestic steel production

capabilities.  *Cf.* 18 U.S.C. § 1001 (requiring such truthful statements to federal agencies).

Commerce reviewed the record, including but not limited to the objections, and denied each of

NLMK's requests.  Compl. ¶ 19.  Now, NLMK claims that Commerce's decisions were wrong,

that those decisions were "induce[d]" by U. S. Steel, and that such "inducement" constitutes a

common law tort.  *Id.* ¶¶ 86-90.

Claims attacking federal agency actions, particularly actions relating to core federal

concerns such as national security and foreign commerce, belong in federal court.  In this case,

removal is appropriate for at least three independent reasons:  (1) because NLMK's claim raises

substantial federal questions under *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545

U.S. 308 (2005), (2) because NLMK's state-law claim is completely preempted by federal law,

*see Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003), and (3) because U. S. Steel was

acting under a federal officer when providing objections to Commerce, *see* 28 U.S.C.

§ 1442(a)(1).

Accordingly, pursuant to 28 U.S.C. §§ 1331, 1441, 1442, and 1446, and with full

reservations of all defenses, Defendant U. S. Steel gives notice of the removal of this action.[1]

## NATURE OF REMOVED ACTION

1.    On January 22, 2021, Plaintiffs filed a complaint in the Court of Common Pleas

of Allegheny County asserting a single count for "Unfair Competition" and alleging that U. S.

Steel wrongfully induced Commerce to deny NLMK's requests to exclude steel slab imports

from tariffs.

---

[1] U. S. Steel is the named defendant and appears here in the exercise of its rights of removal under federal law.  U. S. Steel reserves all procedural, substantive, and other defenses, arguments, and claims available in response to the Complaint, including without limitation the defense that U. S. Steel is an improper defendant in an action challenging Commerce's imposition of tariffs against NLMK.

2.      The tariffs discussed in NLMK's Complaint were imposed pursuant to

Presidential Proclamation 9705, in which the President, acting pursuant to Section 232 of the

Trade Expansion Act of 1962 (19 U.S.C. § 1862, as amended), imposed a 25% ad valorem tariff

on steel imports from countries other than Canada and Mexico.  As the Proclamation explained,

the President reviewed the Secretary of Commerce's finding that the level of steel imports in

January 2018 was "resulting in the persistent threat of further closures of domestic steel

production facilities and the 'shrinking [of our] ability to meet national security production

requirements in a national emergency,'" and the President determined that steel articles were

being "imported into the United States in such quantities and under such circumstances as to

threaten to impair the national security of the United States."  Proclamation 9705 ¶¶ 2, 5

(quotation as in original).  The Secretary of Commerce recommended, and the President

imposed, a 25 percent tariff "on imports of steel articles in order to reduce imports to a level that

the Secretary assessed would enable domestic steel producers to use approximately 80 percent of

existing domestic production capacity."  Proclamation 9705 ¶¶ 4, 8.

3.      At the same time, the President "authorized" the Secretary of Commerce, "in

consultation with" other senior Administration officials including the Secretary of State, the

Secretary of the Treasury, the Secretary of Defense, the United States Trade Representative, the

Assistant to the President for Economic Policy, and the Assistant to the President for National

Security Affairs, "to provide relief" from the tariffs "for any steel article determined not to be

produced in the United States in a sufficient and reasonably available amount or of a satisfactory

quality," as well as based on "specific national security considerations."  Proclamation 9705 § 3.

The President also authorized the Secretary to "issue procedures for [] requests for exclusion."

Proclamation 9705 § 4.

4.      In response to the Proclamation, Commerce created a regulatory administrative process for importers to request exclusions from the Section 232 tariffs and for domestic steel suppliers to "object" to these requests.  83 Fed. Reg. 12106 (Mar. 19, 2018).  Under the regulations, "[o]nly individuals or organizations using steel in business activities (e.g., construction, manufacturing, or supplying steel product to users) in the United States may submit exclusion requests."  *Id.* at 12110.  Additionally, requests must "clearly identify, and provide support for, the basis upon which the exclusion is sought."  *Id.*

5.      As Commerce explained, no request will be granted unless Commerce concludes that the request satisfies certain threshold eligibility criteria.  Specifically, a request will be denied unless Commerce finds that the "article is not produced in the United States in a sufficient and reasonably available amount, is not produced in the United States in a satisfactory quality, or for a specific national security consideration."  *Id*.  If an exclusion request is denied, the requestor is permitted to submit an amended request providing "new or different information in an attempt to meet the criteria for approving an exclusion request."  *Id.* at 12107.

6.      While the regulations "specif[ied] the requirements and process for how parties in the United States may *submit requests* for exclusions . . . ," they did not guarantee that any exclusions would be granted.  *Id.* at 12110 (emphasis added).

7.      To assist in evaluating exclusion requests, Commerce developed an adversarial process through which private domestic steel producers are encouraged to provide relevant information regarding domestic capacity.  *See* 83 Fed. Reg. 46026 (Sept. 11, 2018); 84 Fed. Reg. 26751 (June 10, 2019); 85 Fed. Reg. 81060 (Dec. 14, 2020).  Under the regulations, for example, requestors and objectors are encouraged to engage directly with each other's submissions through filing rebuttals and sur-rebuttals.  *See* 15 C.F.R. Pt. 705, Supp. 1(f)-(g).   Under

Commerce regulations, only "individual[s] or organization[s] that manufacture[] steel or aluminum articles in the United States" are permitted to participate in the objection process.  15 C.F.R. Pt. 705, Supp. 1(d)(1).

8.      The gravamen of NLMK's Complaint is that Commerce improperly denied its tariff exclusion requests under federal law.  According to the Complaint, "Commerce wrongly denied all 162 of NLMK's exclusion requests," Compl, ¶ 19,  "forc[ing] [NLMK] to pay nearly $200 million in tariffs from which it should have . . . been exempt," Compl. ¶ 20.  NLMK seeks to recover damages from U. S. Steel resulting from its payment of these tariffs, based on its contention that U. S. Steel "misl[ed] the Department [of Commerce] into denying exclusions to" NLMK, thereby "forc[ing] NLMK to pay unwarranted tariffs."  Compl, ¶ 46.

9.      NLMK has already pursued that claim against the United States in the Court of International Trade, alleging that Commerce acted arbitrarily and capriciously in denying NLMK's exclusion requests.  *See* Complaint, Dkt. 2 ¶¶ 50-65, *NLMK v. United States,* Case No. 20-0050 (C.I.T. Feb. 27, 2020) ("CIT Complaint").  Among other things, NLMK faulted Commerce for failing to "offer any reasoned basis for its decisions" and providing "conclusory decisions, with no reasoning or analysis."  *Id.* ¶¶ 10, 12.  NLMK has since settled with Commerce, resulting in a stipulated judgment providing for the refund of certain tariff payments. *See NLMK v. United States*, Case No. 20-00050, Dkt. 63 (C.I.T. Nov. 12, 2020).

10.      Now, NLMK is seeking to repackage its federal lawsuit and bring it to state court. Notwithstanding NLMK's prior assertion that Commerce's decisions were published "with no reasoning or analysis," it now contends U. S. Steel is responsible for Commerce's conclusions. *Compare* Compl. ¶¶ 39, 59, 64, 67, with CIT Compl. ¶¶ 10, 12.

11.     Plaintiffs' claims thus directly implicate unique federal interests, making this case removable to federal court for at least three separate reasons.

12.     *First*, NLMK's case should be removed to federal court because the Complaint raises several federal questions that will be disputed and are of substantial importance to the federal government.  *See Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 312 (2005) ("[F]ederal-question jurisdiction will lie over state-law claims that implicate significant federal issues.").  NLMK's Complaint collaterally attacks the decisions of a federal agency, and the federal "Government thus has a direct interest in the availability of a federal forum to vindicate its own administrative action."  *Id.* at 315.

13.     *Second*, NLMK's Complaint raises a claim that is completely preempted by federal law.  *See Beneficial Nat. Bank v. Anderson*, 539 U.S. 1, 8 (2003).  Removal is appropriate "when a federal statute wholly displaces the state-law cause of action through complete pre-emption. When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law."  *Id.* (footnote omitted).

14.     *Third*, this Court has jurisdiction under the federal officer removal statute, 28 U.S.C. § 1442(a)(1).  The federal government—through major legislation, Presidential Proclamation, and administrative programs—has overseen the development of a nationwide process for administering tariffs and exclusions.  As part of that federal process, Commerce is required to evaluate requests for exclusions from Section 232 tariffs, including by determining whether particular steel articles are "produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality."  Proclamation 9705 § 3.  While Commerce could have investigated exclusion requests in any number of ways, Commerce chose to deploy an

adversarial objection process through which objectors like U. S. Steel provide relevant information to assist Commerce in making the required determinations.  This case challenges the legality of the actions that U. S. Steel took while participating in that adversarial process and thereby assisting the Department of Commerce in execution of its duties.  The action therefore is removable.

**BASES FOR REMOVAL**

I.    **Removal Is Proper Because NLMK's Claim Raises Substantial Federal Questions Under *Grable***

15.    Federal courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  Jurisdiction under this statute "is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).

16.    Even where a Complaint purports to rely on state law, federal question jurisdiction still exists where "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities."  *Grable*, 545 U.S. at 314.

17.    That standard is far surpassed here, as NLMK's claim necessarily requires review of a federal agency action, interpretation of federal regulations, and interference with a federal program designed to promote national security and to regulate foreign commerce.  Because NLMK's Complaint is based wholly on the objections U. S. Steel filed with Commerce, the Complaint also necessarily raises federal questions regarding *Noerr-Pennington* immunity.

18.     The gravamen of NLMK's Complaint is that U. S. Steel's conduct in a federal administrative proceeding was improper and led Commerce to an incorrect decision.  That claim requires evaluation of several substantial federal questions, all of which are more appropriately resolved in federal court than in state court.

19.     To begin, NLMK's Complaint is premised on the assertion that NLMK was entitled to exclusions from the imposed Section 232 tariffs.  NLMK's entitlement to the exclusions thus must be decided:  NLMK cannot establish any damages if Commerce properly denied the exclusion requests. And it is actually disputed:  U. S. Steel maintains that NLMK was never entitled to the exclusions to which U. S. Steel (and others) objected.  Commerce, too, has consistently maintained that NLMK was not wrongfully denied any exclusions.  *See* Answer, Dkt. 23 ¶¶ 52, *NLMK v. United States*, Case No. 20-00050 (C.I.T. May 18, 2020) (United States denying NLMK's allegation that NLMK was entitled to the requested tariff exclusions). Whether NLMK was entitled to the tariff exclusions, of course, rests wholly on federal law, as both the Section 232 tariffs and eligibility for exclusions from the tariffs are entirely creatures of federal law.  *See* 19 U.S.C. § 1862; Proclamation 9705; 15 C.F.R. Pt. 705, Supp. 1.

20.     Far from threatening to disturb the federal-state balance if removed to federal court, the question whether a federal agency's action was unlawful is uniquely inappropriate for state court consideration.  As the Supreme Court has long maintained, "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943).  State courts have no authority to second-guess the actions taken by federal agencies under federal law.  In part for that reason, "[p]olicing fraud against federal agencies is hardly a field which the States have traditionally occupied." *Buckman Co. v. Plaintiffs' Legal*

*Comm*., 531 U.S. 341, 347 (2001) (quotation marks omitted).  The most basic dispute in this case thus rests in an area traditionally and uniquely committed to the federal government.

21.     Moreover, the federal questions in this case are not limited to circumstance-specific claims regarding NLMK's exclusion requests.  Instead, NLMK's claim requires resolution of federal questions that go directly to the nature of the Section 232 exclusion request process.  For example, a court addressing NLMK's claims will need to resolve whether *any* party is ever "entitled" to *any* exclusion, or whether Commerce retains discretion to refuse exclusion requests for any reason or no reason at all.  Indeed, the Presidential Proclamation only "authorized," not required, Commerce to provide exclusions from the Section 232 tariffs. Proclamation 9705 § 3.  Similarly, federal regulations do not establish that any party will be "entitled" to an exclusion under any particular circumstances.  Instead, they establish only the minimum requirements a party requesting an exclusion must meet in order to demonstrate *eligibility* for an exclusion.  *See* 15 C.F.R. Pt. 705, Supp. 1(c)(6)(iii)(A) (describing circumstances in which an exclusion "will likely" be granted).  The question whether a federal agency retains discretion under a Presidential Proclamation and its enacting regulations plainly belongs in federal court.

22.     Similarly, NLMK's claim is premised on the contention that U. S. Steel "abused" the process for objecting to Section 232 exclusion requests.  But determining whether U. S. Steel abused the process means analyzing the process itself—including the federal regulations promulgated by a federal agency through notice and comment rulemaking to implement a Presidential Proclamation.  For example, NLMK alleges that U. S. Steel "expressly committed to producing and being willing to provide over 36 million tons of steel slab to its competitors." Compl. ¶ 15.  This claim does not come from a single statement made from U. S. Steel, but

instead is NLMK's interpretation of the substantive import of U. S. Steel's objections to "more than 450 exclusion requests," including requests made by importers other than NLMK. *Id*. Embedded in this allegation, then, are a number of controlling questions of federal law, including at least (1) whether objectors are required—or even encouraged—to account for other objections they have made when reporting their production capacity (and relatedly, whether requestors act properly in submitting dozens of similar and overlapping requests); (2) whether an objection represents a commitment to produce a particular volume of steel slab; (3) whether an objection represents a commitment to provide the slab produced to its competitors; (4) if an objection does represent a commitment to provide the slab to competitors, whether there are any relevant conditions on the commitment, such as the price at which the objector would be willing to sell the steel slab; (5) how objectors are to address requests that cumulatively far exceed the requestors' historical requirements. Each of these questions is likely to be actually disputed, and resolution of any of these questions will influence the conduct of both requestors and objectors in the ongoing Section 232 exclusion process. And Commerce – a U.S. federal agency – is the party that adjudicated implicitly or explicitly these questions in the first instance.

23.     NLMK's Complaint is replete with these embedded federal questions. As another example, NLMK (falsely) asserts that some of U. S. Steel's objections were improper because U. S. Steel lacks the capacity to make "10-inch slab, which represented the overwhelming majority of NLMK's slab requirements." Compl. ¶ 17. But U. S. Steel never represented that it could produce 10-inch slab—instead, U. S. Steel represented that it could produce an adequate alternative product, as specifically provided for in Commerce's objection forms and regulations. *See* "Objection Filing to Posted Section 232 Exclusion Request: Steel," OMB No. 0694-0138, Ex. A to the Declaration of Andrew Stanton, attached hereto as Ex. 2.; *see also* 15 C.F.R. Pt.

705, Supp. 1(c)(6)(ii) (noting that in order to be considered "satisfactory quality," an available product need not be "identical," but "does need to be equivalent as a substitute product"). Whether U. S. Steel properly objected under these circumstances, or whether the availability of a particular alternative was appropriately considered in evaluating an exclusion request, requires evaluating not only federal law but also federal policy.  Permitting state courts to review these questions risks interfering directly in the Section 232 exclusion process and potentially frustrating federal objectives.  These are precisely the circumstances in which the exercise of federal question jurisdiction is most appropriate.

24.     Finally, NLMK will be required to establish that its claim falls within an exception to *Noerr-Pennington* immunity, which generally protects petitioning the government for redress or otherwise attempting to influence government action.  *See, e.g., Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 122 (3d Cir. 1999); *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965).  This doctrine specifically provides full immunity from tort claims under state law.  *See, e.g., Cheminor Drugs*, 168 F.3d at 128-29.

25.     *Noerr-Pennington* immunity is apparent from the face of the Complaint.  And while federal defenses are inadequate to satisfy the well-pleaded complaint rule, "*Noerr-Pennington* immunity is not merely an affirmative defense. Rather, the [] plaintiff has the burden of . . . alleg[ing] facts sufficient to show that *Noerr–Pennington* immunity did not attach." *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1558 n.9 (11th Cir. 1992) (internal quotation marks and citation omitted).  A well-pleaded complaint alleging liability based on acts taken to influence the government would also necessarily allege that an exception to *Noerr-Pennington* applies.  *See In re: Skelaxin (Metaxalone) Antitrust Litig.*, No. 1:12-MD-2343, 2014 WL

12577068, at *3-6 (E.D. Tenn. May 20, 2014) (federal questions are "necessarily raised" where *Noerr-Pennington* applies); *Doran v. Purdue Pharma Co.*, 324 F. Supp. 2d 1147, 1151 (D. Nev. 2004).

26.     NLMK will be required to establish that U. S. Steel's objections were "objectively baseless" in order to prevail despite *Noerr-Pennington*.  *Cheminor Drugs*, 168 F.3d at 122-23. This is no mere factual question but instead requires determining the standards by which exclusion requests and objections were to be judged by Commerce.  That question, in turn, requires interpreting Section 232, Presidential Proclamation 9705, and the relevant enacting regulations.  These complex questions, implicating sensitive areas of federal concern including both foreign commerce and national security, should be determined by a federal court in the first instance.

## II.     Removal Is Proper Because NLMK's Purported State-Law Claim Is Completely Preempted By Federal Law

27.     This Court independently has federal question jurisdiction because NLMK's claim is completely preempted by federal law.  "When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law." *Beneficial*, 539 U.S. at 8.

28.     There is a two-prong test for complete preemption:  (1) "the federal court must first ask whether the statute relied upon by the defendant as preemptive contains civil enforcement provisions within the scope of which the plaintiff's state claim falls," and (2) "the federal court must further inquire whether there is a clear indication of a Congressional intention to permit removal despite the plaintiff's exclusive reliance on state law." *Ry. Labor Executives Ass'n v. Pittsburgh & Lake Erie R. Co.*, 858 F.2d 936, 942 (3d Cir. 1988).  Each prong is satisfied in this case.

29.     As to the first prong, NLMK had (and in fact pursued) a federal cause of action to challenge the denial of its exclusion requests.  NLMK first was entitled to renew its request and provide additional information or supporting evidence during the administrative process.  83 Fed. Reg. 12107, 12110; 15 C.F.R. Pt. 705, Supp. 1(c)(2).  Further, to the extent NLMK was "aggrieved" by that outcome, it was permitted to file suit in federal court under 5 U.S.C. § 702 and 28 U.S.C. § 2631(i).  And, in fact, NLMK filed suit with respect to many of the exclusion requests at issue in this case, settled with the United States, and obtained entry of a stipulated judgment.  *See NLMK v. United States*, Case No. 20-00050, Dkt. 63 (C.I.T. Nov. 12, 2020).

30.     NLMK's federal cause of action engulfs the state claims here.  Both complaints allege that Commerce improperly denied NLMK's tariff exclusion requests.  Compl. ¶ 19; CIT Compl. ¶ 11.  Both complaints allege that U. S. Steel (among others) baselessly objected to those exclusion requests.  Compl. ¶¶ 14-18 ("U. S. Steel could not and would not supply NLMK with the supply it needed, and therefore lacked any legitimate basis to object to NLMK's requests."); CIT Compl. ¶¶ 31-41 ("U. S. Steel … claimed, without any support, that they could manufacture the slabs in the quality and quantity NLMK needs[, but] … none of the objectors could or would meet NLMK's slab requirements").  Both complaints allege that Commerce inappropriately relied on U. S. Steel's representations in denying NLMK's exclusion requests.  Compl. ¶¶ 39, 59, 67 ("Upon information and belief, the Department relied upon U. .S Steel's objections in denying the requests."); CIT Compl. ¶¶ 45-49 ("[T]he Department's decisions were based on the will of the objectors.").  And both complaints allege that NLMK's exclusion requests were wrongfully denied, causing NLMK to pay unwarranted tariffs.  Compl. ¶¶ 8, 33, 35, 46, 60, 90 ("NLMK was wrongly forced to pay substantial tariffs from which it was entitled to

exclusions."); CIT Compl. ¶¶ 31, 52, 56 ("NLMK was and remained entitled to the requested

tariff exclusions [that] … the Department denied.").

31.     Because NLMK's current claim is within the scope of its federal right of action, it

is irrelevant that the elements of NLMK's state cause of action are not "strictly duplicative" of

those in its federal suit against the United States.  *See Aetna Health Inc. v. Davila*, 542 U.S. 200,

216 (2004).  And it is irrelevant that NLMK seeks remedies it could not have obtained through

its federal cause of action.  *Id*. at 215.  As the Supreme Court has explained, the "limited

remedies available" under a federal cause of action are often "an inherent part of the careful

balancing" of a statutory scheme.  *Id*. (quotation marks omitted).  The crucial question is thus not

whether a federal cause of action is identical to a pleaded state cause of action, but instead

whether there is a "federal cause of action vindicating the same interest the plaintiff's state cause

of action seeks to vindicate."  *Ry. Labor Executives Ass'n*, 858 F.2d at 942.  Here, the interest

NLMK seeks to vindicate is its entitlement to Section 232 exclusions, the injury NLMK alleges

results directly from Commerce's refusal of those exclusions, and Congress reasonably

determined that this interest is best vindicated by a suit directly challenging the agency action—

not a collateral attack on the agency decision through a suit against third parties for their

participation in a federal administrative process.[2]

32.     The second prong of the complete preemption test is satisfied by the federal

government's exclusive authority over foreign affairs in general and tariffs in particular.  As the

Supreme Court has explained, "Foreign commerce is pre-eminently a matter of national concern.

'In international relations and with respect to foreign intercourse and trade the people of the

---

[2] Indeed, Congress's choice in this circumstance was constrained by *Noerr-Pennington*; as in this case, a private party who petitions the government to take a certain action is generally immune from suit for any resulting damages.

United States act through a single government with unified and adequate national power.'"
*Japan Line, Ltd. v. Los Angeles Cty*., 441 U.S. 434, 448 (1979) (quoting *Bd. of Trustees v.
United States*, 289 U.S. 48, 59 (1933)).  For that reason, the Constitution expressly commits to
the federal government exclusive authority over tariffs, U.S. Const. Art. I, § 10, cl. 2, and the
exclusive power to regulate foreign commerce, U.S. Const. Art. I., § 8, cl. 3.  In short, "[i]t is
beyond dispute that the authority to regulate international trade is vested exclusively with the
federal government under the express terms of the United States Constitution."  *Wheeling-
Pittsburgh Steel Corp. v. Mitsui & Co*., 26 F. Supp. 2d 1022, 1026 (S.D. Ohio 1998).

33.     Moreover, presidential authority under Section 232 of the Trade Expansion Act,
under which the specific tariffs at issue were imposed, is premised explicitly on national security
concerns, another area of peculiar federal interest.  *See, e.g., United States v. Maine,* 420 U.S.
515, 522 (1975) ("[A]s a matter of purely legal principle . . . the Constitution . . . allotted to the
federal government jurisdiction over foreign commerce, foreign affairs and national defense")
(quotation marks omitted); *Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 604 (2011)
(describing "Presidential conduct of foreign policy" and "foreign affairs power" as "uniquely
federal areas of regulation"); *Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J.,
dissenting) ("The national security, after all, is the primary responsibility and purpose of the
Federal Government.").  State law can have no effect when it would result in "an impermissible
state interference with exclusive federal responsibility in matters of national security."  *See, e.g.,
Stehney v. Perry*, 101 F.3d 925, 939 (3d Cir. 1996).

34.     Unsurprisingly, then, there is no suggestion in the Trade Expansion Act, the
relevant Presidential Proclamation, the enacting regulations, or elsewhere that States should play
any role in altering the tariff landscape.  As another court explained in finding complete

preemption in similar circumstances, "the United States Constitution itself prohibits any state regulation of international trade.  Further, Congress has enacted comprehensive statutes [which] . . . provid[e] damages to an injured party for the same type of harm as alleged in plaintiff's Complaint.  Further, Congress has provided a complex and exclusive administrative scheme whereby parties" may pursue these claims.  *Wheeling-Pittsburgh Steel Corp.*, 26 F. Supp. 2d at 1028 (footnote omitted).  The claims at issue are completely preempted, and federal jurisdiction is proper.  *See id*.

**III.   Removal Is Proper Pursuant To The Federal Officer Removal Statute, 28 U.S.C. § 1442(a)(1).**

35.     The federal officer removal statute, 28 U.S.C. § 1442(a)(1), also allows U. S. Steel to remove this action.  This basis for removal exists to protect operations of the federal government from state interference.  *See In re Commonwealth's Motion to Appoint Counsel Against or Directed to Def. Ass'n of Phila.*, 790 F.3d 457, 466 (3d Cir. 2015) ("*Def. Ass'n*") (citing *Watson v. Phillip Morris Cos., Inc.*, 551 U.S. 142, 150 (2007)).  Thus, "[u]nlike the general removal statute, the federal officer removal statute is to be broadly construed in favor of a federal forum."  *Id*. at 466-67 (quotation marks omitted).

36.     Removal under the federal officer statute is proper because (1) U. S. Steel is a "person" within the meaning of the statute; (2) NLMK's claims are based upon U. S. Steel's conduct in "acting under" the United States, its agencies, or its officers; (3) NLMK's claims against U. S. Steel are "for, or relating to" an act under color of federal office; and (4) U. S. Steel raises colorable federal defenses to the claims.  *Id.* at 467; *see also Golden v. N.J. Inst. of Tech.*, 934 F.3d 302, 311 (3d Cir. 2019) (affirming removal where the dispute implicated governmental confidentiality interests under federal law).

### A.    U. S. Steel Is A "Person"

37.    Any "person" acting under a federal officer may remove an action to federal court pursuant to Section 1442(a)(1).

38.    "[B]ecause the statute does not define 'person,' [courts] look to 1 U.S.C. § 1, which defines the term to 'include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.'" *Def. Ass'n*, 790 F.3d at 467.

39.    U. S. Steel is a corporation organized under the laws of the State of Delaware.  It therefore qualifies as a person for removal purposes.  *Id.* at 468.

### B.    U. S. Steel Is Acting Under A Federal Officer

40.     "The acting under requirement, like the federal removal statute overall, is to be liberally construed to cover actions that involve an effort to assist, or to help carry out, the federal supervisor's duties or tasks." *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 812 (3d Cir. 2016) (quotation marks and emphasis omitted).  The question is not whether the specific alleged conduct was itself "at the behest of a federal agency.  It is sufficient for the 'acting under' inquiry that allegations are directed at the relationship between" the defendant and the federal government.  *Def. Ass'n*, 790 F.3d at 470.

41.    The allegations here squarely target the relationship between U. S. Steel and the federal government.  Commerce designed the Section 232 objection process to assist it in evaluating exclusion requests and encouraged domestic steel producers to participate by providing the information Commerce needed.  NLMK's claims are based on U. S. Steel's participation in this federal program.

1.    **The Section 232 tariffs and related exclusion process involve the federal government's unique interest in foreign commerce and national security.**

42.    The federal government has a dominant role in foreign affairs, including both international commerce and national security.  Indeed, "'[o]ur system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.'"  *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 418 (2003) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 63 (1941)) (brackets in original).

43.    That power is at its apex when dealing with tariffs.  In addition to authorizing Congress to "regulate commerce with foreign nations," the Constitution also bars the States from laying "any imposts or duties on imports."  U.S. Const. Art. I, §§ 8, 10.  "[C]omitting sole power to lay imposts and duties on imports in the Federal government, with no concurrent state power" ensures that the government "speak[s] with one voice when regulating commercial relations with foreign governments."  *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 285 (1976).  Moreover, from the Founding, import revenues have been a "major source of revenue of the Federal Government."  *Id.*

44.    These constitutional principles reflect the reality that setting tariffs requires consideration of both economic and foreign policy concerns, as well as weighing the interests of particular industries against those of other industries and potentially consumers, revenue needs, and more.  *Cf.* Proclamation 9705 (describing considerations in imposing the relevant tariffs); 19 U.S.C. § 1862(d) (listing factors the President must consider before imposing Section 232 tariffs); *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Marshall*, 584 F.2d 390, 395 (D.C. Cir. 1978) (describing tariff policy more generally). Unsurprisingly, in light of these important federal policy implications, both Congress and the

executive branch have taken an active role in shaping and reshaping the tariff system over time. Current tariff rates are established by a complex web of federal statutes, treaties, executive orders, and regulations.  *See, e.g.,* Trade Expansion Act, Pub. L. 87-794, 76 Stat. 872 (1962); Bipartisan Comprehensive Trade Priorities and Accountability Act of 2015, Pub. L. No. 114-26, 128 Stat. 319 (2015); Agreement to Accelerate Tariff Reductions, 33 UST 4490, TIAS 1031815; 15 CFR Pt. 705.

45.     The tariffs in this case reflect that delicate balance.  Section 232 tariffs were imposed on steel products after consideration of "the Secretary[ of Commerce's] report [regarding national security implications], updated import and production numbers for 2017, the failure of countries to agree on measures to reduce global excess capacity, the continued high level of imports [in 2018], and special circumstances that exist with respect to Canada and Mexico."  Proclamation 9705 ¶ 8.  In recognition of the diplomatic implications of the new tariffs, the proclamation also noted that "[a]ny country with which [the United States] ha[s] a security relationship is welcome to discuss . . . alternative ways to address the threatened impairment of the national security" to potentially "remove or modify the restriction on steel articles imports from that country."  *Id.* ¶ 9.

46.     Allowing the possibility of exclusions represents a further fine-tuning of the federal tariff process.  According to the Proclamation, special circumstances might merit exclusions from the generally applicable tariffs, and the Secretary of Commerce is authorized to consider such requests.  Proclamation 9705 § 3.

### 2.     Commerce encouraged the participation of private organizations in the exclusion and objection process to further the federal government's objectives.

47.     Although the President authorized Commerce to provide exclusions if certain findings are made, the Presidential Proclamation did not offer specific guidance as to how

Commerce was to make the required findings (other than through the Secretary's consultations with other senior officials). Instead, the President entrusted the Secretary with the responsibility to "issue procedures for [] requests for exclusion." Proclamation 9705 § 4. By regulation, the Secretary created a process for individuals or organizations who sought exclusions to submit requests to Commerce. The regulations outlined the specific information that requestors were required to provide, including "the basis upon which the exclusion is sought" and "support for" the cited basis. 83 Fed. Reg. 12110.

48.     Neither Proclamation 9705 nor federal regulations suggested that Commerce would or should grant every exclusion request that was submitted. Commerce, rather, was authorized to exercise its discretionary judgment to determine (i) whether the product at issue was sufficiently available in the United States or (ii) whether there was a specific national security concern justifying an exclusion. Commerce thus had to obtain certain information regarding domestic production capacity to make the required determinations.

49.     Rather than using its employees to actively investigate domestic capacity in response to requests, Commerce developed an adversarial process in which domestic steel producers are invited to voluntarily participate. Specifically, Commerce encouraged submissions from domestic steel producers who had reason to "object" to the requested exclusion and potentially pertinent information to share with Commerce. *See* 83 Fed. Reg. 12111.

50.     This system produced considerable efficiencies for Commerce relative to a system in which Commerce evaluated exclusion requests without input from objectors. As the enacting regulations explained, Commerce would "only consider information directly related to the submitted exclusion request that is the subject of the objection." 83 Fed. Reg. 12111. But Commerce was not required to evaluate domestic production capacity from scratch, starting with

21

only the self-interested representations of the requestor.  Instead, because domestic producers

were among the most direct beneficiaries of the Section 232 program—which was specifically

designed to protect the competitive position of the domestic steel industry in the interest of

national security—those producers had an incentive to ensure that exclusions were granted only

where appropriate.  Domestic producers would voluntarily provide Commerce information

needed to determine whether a given steel product was reasonably available, which the federal

government "'would have otherwise used its own agents to complete.'"  *Papp*, 842 F.3d at 812

(quoting *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)).  In sum, the Section 232

process was established by a federal agency under federal law, to serve the unique federal

interests of national security and trade policy, and the voluntary participation of private objectors

is an integral part of the process.

> **3.     U. S. Steel's participation in the adversarial Section 232 process
> assists Commerce in evaluating the availability and quality of
> domestically produced steel products.**

51.     U. S. Steel participates in the exclusion process in order to offer information that

will assist Commerce in performing its exclusion request evaluations.  U. S. Steel provides its

objections on a form created by Commerce and reports this information directly to Commerce.

Commerce has expressly encouraged such participation, and despite repeatedly refining the

exclusion process, has consistently provided a key role for objectors.  When objectors like U. S.

Steel accept that invitation, they are "acting under" Commerce.

52.     U. S. Steel is not acting as a "regulated" entity when participating in the Section

232 exclusion process.  There is no legal requirement that U. S. Steel participate or provide any

particular information to Commerce.  *Cf.* 15 C.F.R. Pt. 705, Supp. 1.  U. S. Steel is voluntarily

participating in a government program designed by a federal agency to assist the agency in

discharging its duties.  Offering such "assistance" to the government is a form of "acting under"

a federal officer. *See, e.g., Doe I v. UPMC*, No. 2-20-cv-359, 2020 WL 4381675, at *3-6 (W.D. Pa. July 31, 2020) (affirming federal officer removal based on voluntary participation in a federal program to implement a nationwide electronic health record).

53.     U. S. Steel's objections cannot be divorced from Commerce's administrative process.  To be sure, U. S. Steel and other domestic steel producers have self-interested incentives to participate in the adversarial Section 232 process that was established to assist the federal government.  But that is virtually always the case for private parties who act under a federal officer—indeed, the "classic case" of acting under a federal officer is a private contractor producing items for the federal government.  *See, e.g., Papp*, 842 F.3d at 812.  The key point is not U. S. Steel's subjective motivation, but that U. S. Steel acted at the invitation of a federal agency to participate in a federal program serving federal policy objectives.  In doing so, U. S. Steel acted under that agency, and is entitled to federal officer removal to ensure that there is no State interference in its relationship with the federal government.

### C.     NLMK's Claim Relates To Actions Under Color Of Federal Office

54.     For removal pursuant to Section 1442(a)(1), the alleged conduct must "have been undertaken 'for or relating to' a federal office." *Papp*, 842 F.3d at 813.  To satisfy this aspect of removal, "it is sufficient for there to be a 'connection' or 'association' between the act in question and the federal office." *Def. Ass'n*, 790 F.3d at 471; *see also Papp*, 842 F.3d at 813 (holding recent amendments to statute have fostered "a more permissive view" of this element).

55.     There is more than a *connection* or *association* between U. S. Steel's alleged conduct and Commerce's evaluation of Section 232 tariff exclusion requests.  The Complaint alleges that U. S. Steel "misle[d] the Department into denying" NLMK's exclusions by "abusing" the Section 232 exclusion and objection process.  Compl. ¶¶ 11, 46.  These allegations are inextricably tied to—and certainly "connected" and "associated" with—U. S. Steel's effort to

assist Commerce in evaluating NLMK's eligibility for tariff exclusions.  *Def. Ass'n*, 790 F.3d at 471.  If NLMK were allowed to sue in state court based on U. S. Steel's conduct under Commerce regulations, it would substantially interfere with achieving the policy objectives set forth in the Presidential Proclamation and its implementing regulations.  *Golden*, 934 F.3d at 310 ("The central aim of the federal officer removal statute is to protect officers of the federal government from interference by litigation in state court" (marks and citation omitted)).  Federal review pursuant to 28 U.S.C. § 1442(a)(1) is therefore warranted.

**D.   U. S. Steel Raises Colorable Federal Defenses To Plaintiffs' Claims**

56.    The final element for federal officer removal requires that the defendant identify a federal defense.  *Def. Ass'n*, 790 F.3d at 472.  This, too, is broadly construed in favor of federal jurisdiction.  *Id*. at 472-74.  Arguments that federal law preempts state law suffice to warrant removal under this element.  *Id*. at 473-74.  Similarly, where there is a dispute over a federal duty, a federal defense exists for removal purposes.  *Id*. at 473 (colorable defense existed where defendant "claim[ed] that it was not violating the terms of" a federal statute); *see also Golden*, 934 F.3d at 311 (defendant raised a colorable federal defense by denying that the records at issue were "federal records within the meaning of 44 U.S.C. § 3301").

57.    U. S. Steel will assert several colorable federal defenses to NLMK's claim.

58.    *First*, as discussed above, U. S. Steel will contend that the conduct at issue— filing materials with Commerce to seek a favorable government action—are immune from suit under the federal *Noerr-Pennington* doctrine.

59.    *Second*, U. S. Steel will assert defenses based on the Presidential Proclamation and regulations governing the Section 232 exclusion request process.  In particular, U. S. Steel will argue NLMK was not entitled to the requested exclusions, Commerce retained discretion to

deny the exclusions, U. S. Steel did not cause the denial of NLMK's exclusion requests, and U. S. Steel's objections were truthful and fully complied with the federal regulations.

60.     *Third*, the Dormant Commerce Clause blocks States from interfering with foreign commerce.  Any "state law that has the 'practical effect' of regulating commerce occurring wholly outside that State's borders is invalid under the Commerce Clause." *Healy v. Beer Inst.*, 491 U.S. 324, 332 (1989).  While this preemptive power is significant in interstate commerce, the Supreme Court has noted that the preclusive effect is still greater when a State's regulation touches on international commerce. *See, e.g., Barclays Bank PLC v. Franchise Tax Bd. of California*, 512 U.S. 298, 311 (1994).  NLMK's allegations directly relate to the functioning of a federal tariff, the quintessential example of the regulation of foreign commerce.

61.     *Finally*, the nature of U. S. Steel's involvement in the Section 232 exclusion process is "inherently federal in character because the relationship" between U. S. Steel and Commerce "originates from, is governed by, and terminates according to federal law." *Buckman*, 531 U.S. at 347 (state law claims stemming from defendant's representations to a federal agency were preempted).  Federal judicial review is available to assess allegations about the nature of that relationship. *See Def. Ass'n*, 790 F.3d at 474 (affirming removal on the basis of *Buckman* preemption).

## COMPLIANCE WITH PROCEDURAL REQUIREMENTS

62.     U. S. Steel has satisfied all the procedural requirements for removal under 28 U.S.C. § 1446.

63.     U. S. Steel files this Notice of Removal pursuant to 28 U.S.C. § 1441(a) in the United States District Court for the Western District of Pennsylvania, because the State court in which the action is pending, the Court of Common Pleas for Allegheny County, is within this

federal judicial district.  This Notice is signed pursuant to Rule 11 of the Federal Rules of Civil Procedure.

64.     Plaintiffs served the Complaint on U. S. Steel on or after January 27, 2021.  U. S. Steel removed the case within 30 days of that date; therefore, this removal is timely under 28 U.S.C. § 1446(b).  *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999).

65.     A copy of "all process, pleadings, and orders served upon" U. S. Steel in state court are attached hereto as Exhibit 1 in accordance with 28 U.S.C. § 1446(a).

66.     In accordance with 28 U.S.C. § 1446(d), promptly after filing this Notice, U. S. Steel will "give written notice thereof to all adverse parties," and will "file a copy of the notice with the clerk" of the Court of Common Pleas of Allegheny County.  A true and correct copy of the Notice to Plaintiff and Notice to the State Court of Filing of Notice of Removal will be filed as separate documents.

67.     Nothing in this Notice of Removal shall be interpreted as a waiver or relinquishment of U. S. Steel's right to assert any and all defenses or objections to the Complaint.

68.     If there are any questions that arise as to the propriety of removal of this action, U. S. Steel respectfully requests the opportunity to submit briefing, argument, and additional evidence as necessary to support removal of this case.

Dated: February 25, 2021

Respectfully submitted,

/s/ *Andrew R. Stanton*
Andrew R. Stanton (Pa. #93409)
Roy Powell (Pa. #37487)
Tarek Abdalla (Pa. #59924)
Simone DeJarnett (Pa. #321045)
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
Tel: (412) 391-3939
Fax: (412) 394-7959
astanton@jonesday.com
rapowell@jonesday.com
tabdalla@jonesday.com
sdejarnett@jonesday.com

Leon F. DeJulius, Jr. (Pa. #90383)
Kelly C. Holt (Mass. #703505)*
JONES DAY
250 Vesey Street
New York, NY 10281
Tel: (212) 326-3939
Fax: (212) 755-7306
lfdejulius@jonesday.com
kholt@jonesday.com
*Admitted Only in Massachusetts;
Pro hac vice motion to be filed*

*Counsel for U. S. Steel*

## CERTIFICATE OF SERVICE

I hereby certify that this 25th day of February, 2021, I served a copy of the foregoing

Notice of Removal, together with all exhibits thereto, on the following counsel via the method

indicated:

William Pietragallo, II
PIETRAGALLO GORDON ALFANO BOSICK &
RASPANTI, LLP
Firm I.D. No. 834
The Thirty-Eight Floor
One Oxford Centre
Pittsburgh, PA 15219
Telephone: 412.263.2000
wp@pietragallo.com
*Via electronic mail and first class*
*U.S. mail, postage prepaid*

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
CHAFFETZ LINDSEY LLP
The Thirty-Third Floor
1700 Broadway
New York, NY 10019
Telephone: 212.257.6960
sandy.litvack@chaffetzlindsey.com
andrew.poplinger@chaffetzlindsey.com
r.matthew.burke@chaffetzlindsey.com
*Via electronic mail and first class*
*U.S. mail, postage prepaid*

 /s/ *Andrew R. Stanton*
Andrew R. Stanton
*Counsel for U. S. Steel*