IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NLMK PENNSYLVANIA, LLC and NLMK INDIANA, LLC<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES STEEL CORPORATION,<br><br>*Defendant*. | Civil Action No. 2:21-cv-273<br><br>Hon. William S. Stickman IV |

**OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

Upon the recommendation of the United States Secretary of Commerce ("Secretary of Commerce"), President Donald J. Trump ("the President"), imposed tariffs on steel imports. The tariffs were not universal, however, in that the President authorized the United States Department of Commerce ("Department of Commerce") to exclude certain steel articles if those articles were not produced in a sufficient and reasonably available amount or satisfactory quality, or if national security concerns weighed against imposing the tariffs. The Department of Commerce published an interim rule setting forth the procedures and methods governing the underlying exclusion process, which required, *inter alia*, an application from the party seeking an exclusion. The Department of Commerce also created a process for third parties to object to a request for exclusion.

Plaintiffs, NLMK Pennsylvania, LLC, and NLMK Indiana, LLC (collectively "NLMK"), filed a one-count Complaint in the Court of Common Pleas of Allegheny County, Pennsylvania asserting a state-law unfair competition claim. The Complaint alleges that NLMK submitted

1

exclusion requests to the Department of Commerce and that Defendant, United States Steel Corporation ("U.S. Steel"), engaged in unfair competition by making various misrepresentations to the Department of Commerce during its evaluation. NLMK contends that these misrepresentations resulted in the wrongful imposition of the tariffs to its products, which caused it direct and indirect economic damages.

U.S. Steel removed the case to this Court on the ground that jurisdiction is proper because NLMK's unfair competition claim necessarily raises disputed and substantial federal questions under *Grable & Sons Metal Prod.'s, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).[1] NLMK filed a Motion to Remand (ECF No. 18), asking the Court to remand the case for lack of subject matter jurisdiction.

The question now before the Court is whether a federal district court has federal question jurisdiction to adjudicate a state-law unfair competition claim arising out of alleged misrepresentations made to the Department of Commerce under the framework it created to govern whether a tariff exclusion is warranted. For the reasons that follow, the Court holds that NLMK's unfair competition claim necessarily raises disputed and substantial federal issues that are capable of resolution in federal court without disturbing the federal-state balance approved by Congress. The Court will therefore deny NLMK's Motion to Remand. (ECF No. 18).

---

[1] U.S. Steel also argues that the Court may adjudicate the state law claim because the claim is completely preempted by federal law, and the claim implicates the conduct of a federal officer. (ECF No. 1, p. 3). The Court need not address these contentions because, for the reasons set forth below, it holds that the unfair competition claim necessarily raises disputed and substantial federal issues that are capable of resolution without disrupting the federal-state balance approved by Congress.

# I.      BACKGROUND

## A.      Statutory and Regulatory Background

To determine whether the Court has subject matter jurisdiction over NLMK's state-law action, the Court must examine the statutory and regulatory framework regarding the imposition of the tariffs and the procedure used by the Department of Commerce in making its determination of NLMK's request for exemption from the tariffs.

Under Section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (1962) (codified as amended at 19 U.S.C. § 1862) (hereinafter Section 232), Congress authorized and empowered the President, upon receipt and agreement with specific findings of an executive officer, to take actions necessary to address national security threats posed by imported goods.  Under the statute, upon receiving a "request of the head of any department or agency, upon application of an interested party, or upon his own motion," the Secretary of Commerce must "initiate an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion." 19 U.S.C. § 1862(b)(1)(A). At the same time, "the Secretary [of Commerce] shall immediately provide notice to the Secretary of Defense of any investigation initiated . . . ."  19 U.S.C. § 1862(b)(1)(B).  The Secretary's investigation is informed and advised by various officers of the United States—most notably the Secretary of Defense on "methodological and policy questions"—and "if it is appropriate and after reasonable notice, [the Secretary shall] hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to [the] investigation."  19 U.S.C. § 1862(b)(2)(A)(i)–(iii).

Upon completion of the investigation, the Secretary must submit a report detailing the findings "with respect to the effect of the importation of such article in such quantities or under such circumstances upon national security" and provide recommendations for action or inaction

of the President.  19 U.S.C. § 1862(b)(3)(A).  Furthermore, if the Secretary determines that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall so advise the President in such report."  *Id.*  Thereafter, the President shall "determine whether [he] concurs with the finding of the Secretary, and if the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security."  19 U.S.C. § 1862(c)(1)(A)(i)–(ii).

Congress also provided various considerations that both the President and the Secretary must consider in making their determinations:

> the Secretary and the President shall, in the light of the requirements of national security and without excluding other relevant factors, give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and the capacity of the United States to meet national security requirements. In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

19 U.S.C. § 1862(d).

The specific tariffs underlying the dispute in this case arose after the Secretary of Commerce initiated an investigation to determine the effects of steel imports on national security

on or about April 26, 2017.[2]   The Secretary accordingly notified the United States Secretary of Defense, James N. Mattis, of his "investigation to determine the effects of imported steel on national security."[3]  The President then requested an expeditious investigation, with considerations and recommendations concerning the nation's security.[4]

Upon finishing his investigation, the Secretary sent his report to the President.[5]  The Secretary of Commerce found that domestic steel production was essential to national security, and more specifically, that the importation of foreign flat, long, semi-finished, pipe and tube, and stainless steel were adversely impacting both national security and the steel industry.[6]  The Secretary found that "the present quantities and circumstance of steel imports are 'weakening our internal economy' and threaten to impair the national security as defined in Section 232."[7]  The Secretary highlighted that "[n]umerous U.S. steel mill closures, a substantial decline in employment, lost domestic sales and market share, and marginal annual net income for U.S.-based steel companies illustrate the decline of the U.S. steel industry."[8]  Excessive imports were further

---

[2] Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel, 82 Fed. Reg. 19,205, 19,205 (Apr. 26, 2017).

[3] Letter from the Secretary of Commerce to the Secretary of Defense (Apr. 19, 2017) (on file with the Department of Commerce).

[4] Administrative Memorandum from Administration of Donald J. Trump to the Secretary of Commerce on Steel Imports and Threats to National Security DCPD201700259 (Apr. 20, 2017) (on file with the Government Publishing Office).

[5] Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended, 85 Fed. Reg. 40,202, 40,202 (Jul. 6, 2020) (hereinafter Steel Report); *see also* Adjusting Imports of Steel Into the United States, Proclamation 9705 of March 8, 2018, 83 Fed. Reg. 11,625, 11,625 (Mar. 8, 2018) (hereinafter Proclamation 9705).

[6] Steel Report at 40,204.

[7] *Id.*

reducing U.S. steel production capacities to an economically unsustainable position.[9]   The Secretary determined that U.S. steel producers would "face increasing competition from imported steel as other countries export more steel to the United States to bolster their own economic objectives and offset loss of markets to Chinese steel exports."[10]   The Secretary therefore concluded "that the only effective means of removing the threat of impairment is to reduce imports to a level that should, in combination with good management, enable U.S. steel mills to operate at 80 percent or more of their rated production capacity."[11]

To accomplish that goal, the Secretary presented two options.   The first being that the President impose either a global quota limiting steel imports to 63% of 2017 imports or a global tariff of 24% on all steel imports.[12]   The second being that the President impose a 53% tariff on Brazil, South Korea, Russia, Turkey, India, Vietnam, China, Thailand, South Africa, Egypt, Malaysia and Costa Rica, as well as limit imports from other countries to their 2017 levels.[13]   The Secretary recommended that the President consider an exemption process from the options above premised "on an overriding economic or security interest of the United States." [14]   The Secretary additionally recommended "an appeal process by which affected U.S. parties could seek an

---

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.*

[12] *Id.* at 40,205.

[13] *Id.*

[14] *Id.*

exclusion from the tariff or quota imposed."[15]  Under that process, the Secretary of Commerce "would grant exclusions based on a demonstrated: (1) lack of sufficient U.S. production capacity of comparable products; or (2) specific national security[-]based considerations."[16]  If an exclusion were granted, the Secretary of Commerce "would consider at the time whether the quota or tariff for the remaining products needs to be adjusted to increase U.S. steel capacity utilization to a financially viable target of 80 percent."[17]

Although the Secretary of Defense agreed "that imports of foreign steel and aluminum based on unfair trading practices impair the national security[,] . . . . [he] [did] not believe that the findings in the reports impact the ability of [the Department of Defense] programs to acquire steel or aluminum necessary to meet national defense."[18]  The Secretary of Defense also expressed concern about potential negative impacts on key allies and recommended targeted tariffs instead of global quotas or tariffs.[19]

The President agreed with the findings of the Secretary of Commerce, and after considering the recommendations, initially elected "to adjust the imports of steel articles by imposing a 25 percent ad valorem tariff on steel articles . . . imported from all countries except Canada and Mexico."[20]  The President authorized the Department of Commerce to exclude certain steel

---

[15] *Id.* at 40,206.

[16] *Id.*

[17] *Id.*

[18] Memorandum from the Secretary of Defense to the Secretary of Commerce on Response to Steel and Aluminum Policy Recommendations (Feb. 22, 2018) (on file with the Department of Commerce).

[19] *Id.*

[20] Proclamation 9705 at 11,626.

articles from the imposition of tariffs where those articles are "determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and [the Department of Commerce] is also authorized to provide such relief based upon specific national security considerations."[21]   The President also ordered the Secretary of Commerce to continually monitor steel imports, consult various officials, review imports for national security and inform the President of any circumstances requiring further actions or circumstances indicating the duty rate is no longer necessary.[22]

The Department of Commerce subsequently published an interim final rule interpreting Proclamation 9705 and establishing the procedures and methods for obtaining exclusions from the imposition of tariffs on certain steel articles.[23]   Under that rule, "directly affected individuals or organizations located in the United States may submit an exclusion request."[24]   "An individual or organization is 'directly affected' if they are using steel in business activities (e.g., construction, manufacturing, or supplying steel product to users) in the United States."[25]   Individuals or

---

[21] *Id.* at 11,627.

[22] *Id.* at 11,628.  The President subsequently issued a number of Proclamations adjusting tariffs, quotas and exemptions for various countries.  The substance of those Proclamations, however, is not material at this stage of the litigation.

[23] *See generally* Requirements for Submissions Requesting Exclusions from the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum, 83 Fed. Reg. 12,106, 12,110 (Mar. 19, 2018) (currently codified at 15 C.F.R. pt. 705, Supp. 1 (2020)).

[24] 15 C.F.R. pt. 705, Supp. 1, ¶ (c)(1).

[25] *Id.*

organizations are required to submit exclusion requests, objections to exclusion requests, rebuttals, and surrebuttals to an online web portal.[26]

The Department of Commerce requires separate exclusion requests to be submitted for steel products (including products falling into more than one ten-digit Harmonized Tariff Schedule of the United States ("HTSUS") statistical reporting number) "with chemistry by percentage breakdown by weight, metallurgical properties, surface quality (e.g., galvanized, coated), and critical dimensions covered by a common HTSUS statistical reporting number."[27]  The Department of Commerce "will approve exclusions on a product basis, and the approvals will be limited to the individual or organization that submitted the specific exclusion request, unless [the Department of] Commerce approves a broader application . . . ."[28]  Each exclusion request must "specify the business activities in the United States within which the requester is engaged that qualify the individual or organization to be directly affected and thus eligible to submit an exclusion request."[29]  Each request "should clearly identify, and provide support for, the basis upon which the exclusion is sought."[30]  "An exclusion will only be granted if an article is not produced in the United States in a sufficient and reasonably available amount, is not produced in the United States in a satisfactory quality, or for specific national security considerations."[31]

---

[26] *Id.* at ¶ (b).

[27] *Id.* at ¶ (c)(2).

[28] *Id.*

[29] *Id.* at ¶ (c)(5).

[30] *Id.*

[31] *Id.*

The interim final rule made provisions for third parties to object to exclusion requests. Any objections submitted in opposition to exclusion requests must:

> clearly identify, and provide support for, its opposition to the proposed exclusion, with reference to the specific basis identified in, and the support provided for, the submitted exclusion request. If the objector is asserting that it is not currently producing the steel or aluminum identified in an exclusion request but can produce the steel or aluminum and make that steel or aluminum available "immediately" in accordance with the time required for the user of steel or aluminum in the United States to obtain the product from its foreign suppliers, the objector must identify how it will be able to produce and deliver the quantity of steel or aluminum needed either within eight weeks, or if after eight weeks, by a date which is earlier than the named foreign supplier would deliver the entire quantity of the requested product. It is incumbent on both the exclusion requester, and objecting producers, to provide supplemental evidence supporting their claimed delivery times. This requirement includes specifying in writing to the Department of Commerce as part of the objection, the timeline the objector anticipates in order to start or restart production of the steel included in the exclusion request to which it is objecting.[32]

After the submission process is complete (including the submission of any remaining rebuttals or surrebuttals), the Department of Commerce "reviews the complete exclusion requests to determine whether the article described in the request meet[s] any of three criteria, namely 'the article is not produced in the United States in a sufficient and reasonably available amount, is not produced in the United States in a satisfactory quality, or for specific national security concerns.'" *JSW Steel*, 466 F. Supp. 3d at 1324 (quoting 15 C.F.R. pt. 705, Supp. 1, ¶¶ (c)(6), (h)(2)).[33] The Department of Commerce defines both quantity and quality as follows:

---

[32] *Id.* at ¶ (d)(4).

[33] Although the Department of Commerce has since amended its original interim final rule, the substantive process remains the same. The Department of Commerce may grant exclusions "to 'directly affected individuals or organizations located in the United States . . . . [who use steel or aluminum] in business activities' and [it] retain[s] 'the discretion to make exclusion requests available to all importers if [it] find[s] the circumstances so warrant.'" *Thyssenkrupp Materials NA Inc. v. United States*, 498 F. Supp. 3d 1372, 1376 n.1 (C.I.T. 2021) (citing various amendments to the interim final rule); *see also* Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum, 83 Fed. Reg. 46,026, 46,048–46,053 (Sept. 11, 2018); Implementation of New Commerce Section 232 Exclusions Portal, 84 Fed. Reg. 26,751, 26,753,

The exclusion review criterion "Not produced in the United States in a sufficient and reasonably available amount" means that the amount that is needed by the end user requesting the exclusion is not available immediately in the United States to meet its specified business activities. Available "immediately" means that a product (whether it is currently being produced in the United States, or could be produced in the United States) can be delivered by a U.S. producer "within eight weeks", or, if that is not possible, by a date earlier than the time required for the requester to obtain the entire quantity of the product from the requester's foreign supplier. Furthermore, to the extent that an objector can produce and deliver a portion, which is less than 100 percent, but ten percent or more, of the amount of steel or aluminum needed in the business activities of the user in the United States described in the exclusion request, the Department of Commerce may deny a requested exclusion for that percentage of imported steel or aluminum. It is incumbent upon both the exclusion requester, and objecting producers, to provide supplemental evidence supporting their claimed delivery times.

. . .

The exclusion review criterion "not produced in the United States in a satisfactory quality" does not mean the steel or aluminum needs to be identical, but it does need to be equivalent as a substitute product. "Substitute product" for purposes of this review criterion means that the steel or aluminum being produced by an objector can meet "immediately" (see paragraph (c)(6)(i) of this supplement) the quality (e.g., industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S.-produced steel to be used in that business activity in the United States by that end user.[34]

In addition to the determination of whether a product is produced in the United States in a sufficient and reasonable quantity and to an acceptable level of quality, the Secretary of Commerce is required to make a separate determination on the national security implications of each exclusion request:

The exclusion review criterion "or for specific national security considerations" is intended to allow the U.S. Department of Commerce, in consultation with other parts of the U.S. Government as warranted, to make determinations whether a particular exclusion request should be approved based on specific national security considerations.[35]

_____

26,757–26,760 (Jun. 10, 2019); Section 232 Steel and Aluminum Tariff Exclusions Process, 85 Fed. Reg. 81,060, 81,069–81,071 (Dec. 14, 2020).

[34] 15 C.F.R. pt. 705, Supp. 1, ¶¶ (c)(6)(i)–(ii).

[35] *Id.* at ¶¶ (c)(6)(iii).

11

The Department of Commerce will typically issue its decision within 106 days of the exclusion request being posted to the online portal, and the Department "will grant properly filed exclusion requests which meet the requisite criteria, receive no objections, and present no national security concerns."[36]  If no objections are submitted, the Bureau of Industry and Security "will immediately assess the request for any national security concerns."[37]  If the Bureau of Industry and Security "identifies no national security concerns, it will post a decision granting the exclusion request in the . . . [p]ortal."[38]

### B.      Factual Background

NLMK supplies steel sheet and coil to the construction, automotive, pipe and tube, and heavy equipment industries.  (ECF No. 1-2, ¶ 21).  NLMK and U.S. Steel directly compete with one another for customers in various markets, including pipe and tube, service center, yellow goods, agricultural, construction and coated conversion products.  (ECF No. 1-2, ¶ 12).  To fulfill the orders of customers, NLMK typically imports ten-inch and eight-inch steel slab feedstock to construct finished products.  (ECF No. 1-2, ¶¶ 13, 22–23, 29–30).  To that end, NLMK has limited capacity to produce eight-inch slab, and only one domestic producer is capable of producing ten-inch slab—ArcelorMittal—which consumes all of its ten-inch slab in furtherance of its own operations.  (ECF No. 1-2, ¶¶ 23, 29–30).

NLMK alleges that, seeking to exploit NLMK's need for imported steel slab, "U.S. Steel hatched a scheme to prevent its competitors from obtaining . . . tariff exemptions . . . . forc[ing] NLMK to pay unwarranted tariffs, thereby driving up NLMK's costs, unfairly limiting its ability

---

[36] *Id.* at ¶¶ (h)(2)(ii), (h)(3)(i).

[37] *Id.* at ¶ (h)(2)(ii).

[38] *Id.*

to . . . participate in the market, . . . meet contractual obligations to . . . its customers, . . . maintain sales volume[,] . . . compete with U.S. Steel on price[,] . . . and make substantial investments to increase its capacity . . . ."  (ECF No. 1-2, ¶ 46).  In this endeavor, NLMK alleges that U.S. Steel "objected to every one of NLMK's requests covering steel slab from both Russia and Brazil." (ECF No. 1-2, ¶ 36).

NLMK claims that U.S. Steel's objections to its exclusion requests for ten-inch steel slab included various fraudulent misrepresentations to the Department of Commerce, including: (1) falsely answering that it manufactured, or could manufacture within eight weeks, ten-inch steel slab; (2) falsely answering that it could supply one hundred percent of NLMK's tonnage requirements in a timely manner; (3) falsely representing that it could sufficiently satisfy NLMK's orders for ten-inch steel slab; (4) falsely indicating that it is capable of producing ten-inch steel slab; (5) falsely providing that it could make an identical product in place of ten-inch steel slab; and (6) falsely representing that it engaged in multiple exchanges and proposals with NLMK for the sourcing of ten-inch steel slab.  (ECF No. 1-2, ¶¶ 50–67).  Also, U.S. Steel's objections to NLMK's exclusion requests for eight-inch steel slab allegedly included false representations to the Department of Commerce that it was able to manufacture and supply all of the volume cited in the exclusion requests and that it had capacity to supply those amounts.  (ECF No. 1-2, ¶ 68).

NLMK avers that the above representations were false because, among other things, U.S. Steel is neither capable of producing ten-inch steel slab, nor has it sold ten-inch steel slab to anyone.  (ECF No. 1-2, ¶ 57).  Moreover, NLMK avers that U.S. Steel never had the capacity to produce the eight-inch steel slab quantities specified in NLMK's exclusion requests because U.S. Steel was not operating at full capacity because of planned outages at its facilities—potentially stemming from unplanned outages and product delays—and even if it could operate at full capacity

(normally steel mills max out at eighty to eighty-five percent capacity), its production capacity would represent roughly one percent of the domestic market—far less than required by NLMK's exclusion requests.  (ECF No. 1-2, ¶¶ 74–76).  U.S. Steel's capability of producing and supplying sufficient quantities of eight-inch steel slab is allegedly substantiated because U.S. Steel announced, during the relevant time, that it was then going to be importing steel articles from its facilities in Europe to finish its own products.  (ECF No. 1-2, ¶¶ 77–79).

NLMK avers that U.S. Steel's false representations to the Department of Commerce resulted in the unfair denial of tariff exclusion requests for ten-inch and eight-inch steel slab.  (ECF No. 1-2, ¶ 81).  It claims that due to those increased trade costs, "NLMK's costs have been artificially inflated, impeding its ability to compete for new business . . . ."  (ECF No. 1-2, ¶ 82).  That includes a planned capital investment of more than $680 million to expand facilities and increase capacities, cancellation of contracts with customers, and the idling of approximately 550 steelworkers in Western Pennsylvania.  (ECF No. 1-2, ¶¶ 82–84).  From these allegations, NLMK brought a single cause of action for "unfair competition" under Pennsylvania law, requesting compensatory and punitive damages because U.S. Steel knowingly and willfully made misrepresentations to the Department of Commerce to secure denials of numerous tariff exclusion requests, and those denials resulted in the unfair interference and obstruction with NLMK's business relationships, as well as its ability to competitively compete in the steel market.  (ECF No. 1-2, ¶¶ 86–90).

## II.    ANALYSIS

Federal district courts do not have unlimited jurisdictional authority because they hold "only that power authorized by the Constitution and statute."  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377 (1994))

(internal quotation marks omitted). Congress has authorized the federal district courts to exercise "original jurisdiction [over] all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "The propriety of removal . . . depends on whether the case originally could have been filed in federal court." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 163 (1997) (citation omitted).

The presence of subject matter jurisdiction is always required, and it can neither be waived nor forfeited. *Gonzales v. Thaler*, 565 U.S. 134, 141 (2012). To that end, a district court is required "to consider *sua sponte* issues that the parties have disclaimed or have not presented." *Id.* (citation omitted). These jurisdictional inquiries require "sensitive judgments about congressional intent, judicial power, and the federal system." *Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 810 (1986). A district court has federal question jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States[,]" 28 U.S.C. § 1331, and typically "a case arises under federal law when the federal law creates the cause of action asserted." *Gunn*, 568 U.S. at 257 (citation omitted). Where, as here, a cause of action is premised on state law, there exists a "special and small category of cases in which arising under jurisdiction still lies." *Goldman v. Citigroup Glob. Mkts Inc.*, 834 F.3d 242, 249 (3d Cir. 2016) (quoting *Gunn*, 568 U.S. at 258) (internal quotation marks omitted). That category finds its inception "nearly 100 years" ago, and it "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1019 (2d Cir. 2014) (quoting *Grable*, 545 U.S. at 312) (internal quotation marks omitted). Unfortunately, until more recently, "delineating the parameters of federal jurisdiction in such circumstances has presented a

constant challenge[,]" *id.* (citations omitted), one likened to painting on a canvas that Jackson Pollock got to first. *See Gunn*, 568 U.S. at 258 ("Unfortunately, the canvas looks like one that Jackson Pollock got to first."); *see also Gully v. First Nat. Bank in Meridian*, 299 U.S. 109, 117–18 (1936) (Cardozo, J.) ("What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation. One could carry the search for causes backward, almost without end. Instead, there has been a selective process which picks the substantial causes out of the web and lays the other ones aside.") (citations omitted).

To discern whether this is one of those cases, the Court must answer the following question: "[d]oes the 'state-law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities?'" *Gunn*, 568 U.S. at 258 (quoting *Grable*, 545 U.S. at 314). This question is answered affirmatively "if a federal issue: is (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Id.* In other words, "[w]here all four of these requirements are met, . . . jurisdiction is proper because there is a 'serious federal interest in claiming the advantages thought to be inherent in a federal forum,' which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id.* (quoting *Grable*, 545 U.S. at 313–14).

U.S. Steel primarily argues that the Court has federal question jurisdiction to hear this case because proving causation on NLMK's unfair competition claim will require both the interpretation of federal regulations governing the Department of Commerce's discretion to grant or deny exclusions, as well as a probing examination of the actual use of that discretion.

Specifically, U.S. Steel asserts that NLMK's claim requires  second-guessing of the decision of the Department of Commerce on matters affecting national security.  (ECF No. 23, pp. 10–18).  In other words, seeing this case through will necessarily raise disputed and substantial federal issues that are capable of resolution under *Grable*.  NLMK, however, requests that the Court remand this case to state court for lack of subject matter jurisdiction on the ground that any federal issues are isolated from the matters that must be determined in adjudicating its state-law claim and, therefore, are not "substantial."  Thus, it argues, jurisdiction is effectively foreclosed by the decision in *Gunn*. (ECF No. 19, pp. 10–16).  The Court disagrees.  For the reasons set forth below, NLMK's unfair competition claim necessarily raises disputed and substantial federal issues that are capable of resolution in federal court without disturbing the federal-state balance approved by Congress and, therefore, federal question jurisdiction is present.

### 1) NLMK's State-Law Claim Necessarily Raises Federal Issues That Are Actually Disputed.

As a threshold matter, the Court must be satisfied that NLMK's unfair competition claim necessarily raises federal issues, and that those issues are actually disputed.  Federal issues are necessarily raised where "vindication of a right under state law must necessarily turn on some construction of federal law."  *Manning*, 772 F.3d at 163 (quoting *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 9 (1983)) (internal quotation marks omitted) (cleaned up).  "Under the analysis set forth in *Gunn* and *Manning*, the court must look at the elements of the state-law causes of action" to examine whether they turn on a construction of federal law.  *City of Greensburg v. Wisneski*, 75 F. Supp. 3d 688, 694 (W.D. Pa. 2015)

Both parties appear to agree that the adjudication of NLMK's common law unfair competition claim necessarily raises federal issues and that those issues are actually disputed. (ECF No. 19, p. 11); (ECF No. 23, p. 11).  Nevertheless, neither party has explored the underlying

elements of an unfair competition claim in Pennsylvania.  If they had, their research would have

revealed—as the Court's own did—that Pennsylvania's law of unfair competition is still in a state

of development.  *See Checker Cab Phila., Inc. v. Uber Techs., Inc.*, 689 F. App'x 707, 709 (3d

Cir. 2017) (citations omitted) (noting "that the contours of Pennsylvania unfair competition law

are not entirely clear."); *see also Sandoz Inc. v. Lannett Co. Inc.*, No. 20-3538, 2020 WL 7695960,

at *6 (E.D. Pa. Dec. 28, 2020) (citing cases and discussing differing views of Pennsylvania's unfair

competition claim).  To that extent, courts have not agreed on the underlying framework of unfair

competition claims—some apply the Restatement (Third) of Unfair Competition (1995) and others

decline to do so[39]—but there is a general consensus that "*all* unfair competition claims recognized

---

[39] For cases applying the Restatement (Third) of Unfair Competition, see *M3 USA Corp. v. Hart*,
No. 20-5736, 2021 WL 308162, at *17 (E.D. Pa. Jan. 29, 2021); *Mallet and Co. Inc. v. Lacayo*,
No. 19-1409, 2020 WL 6866386, at *11 (W.D. Pa. Nov. 23, 2020); *Ilapak, Inc. v. Young*, No. 20-
1877, 2020 WL 2787689, at *4 (E.D. Pa. May 29, 2020); *Teva Pharma. USA, Inc. v. Sandhu*, 291
F. Supp. 3d 659, 679 (E.D. Pa. 2018); *Tungsten Heavy Powder and Parts, Inc. v. Global Tungsten
& Powders Corp.*, No. 17-1948, 2018 WL 3304550, at *3 (M.D. Pa. Jul. 5, 2018); *NSI Nursing
Solutions, Inc. v. Volume Recruitment Serv.'s, LLC*, No. 17-1613, 2018 WL 3023542, at * 4 (E.D.
Pa. Jun. 18, 2018); *Brandywine Village Assoc.'s v. Carlino East Brandywine, L.P.*, No. 16-5209,
2018 WL 1470124, at *5 (E.D. Pa. Mar. 26, 2018); *DePuy Synthes Sales, Inc. v. Globus Med.,
Inc.*, 259 F. Supp. 3d 225, 246 (E.D. Pa. 2017); *Med. Diagnostic Lab.'s, LLC v. Indep. Blue Cross*,
No. 16-5855, 2017 WL 3776619, at *8–9 (E.D. Pa. Aug. 30, 2017); *E. Frank Hopkins Seafood,
Co., Inc. v. Olizi*, No. 17-1558, 2017 WL 2619000, at *7 (E.D. Pa. Jun. 16, 2017); *Bobrick
Washroom Equip., Inc. v. Scranton Prod.'s, Inc.*, No. 14-00853, 2017 WL 2126320, at *10 (M.D.
Pa. May 16, 2017); *Fleming Steel Co. v. Jacobs Engineering Group, Inc.*, No. 16-727, 2016 WL
9409024, at *8 (W.D. Pa. Dec. 29, 2016); *Avanti Wind Sys.'s, Inc. v. Shattell*, No. 14-98, 2016 WL
3211990, at *18 (W.D. Pa. Jun. 9, 2016); *Peek v. Whittaker*, No. 13-1188, 2014 WL 2154965, at
*10 (W.D. Pa. May 22, 2014); *Source Healthcare Analytics, Inc. v. SDI Health LLC*, No. 2290
Feb. Term 2011, at *17 (Pa. Phila. Cnty. Ct. Comm. Pleas Jan. 14, 2014); *Hasu Shah v. Harristown
Dev. Corp.*, No. 12-2196, 2013 WL 6567764, at *11 (M.D. Pa. Dec. 13, 2013); *Eagle v. Morgan*,
N. 11-4303, 2013 WL 943350, at *16 (E.D. Pa. Mar. 12, 2013); *Eagle v. Morgan*, No. 11-4303,
2011 WL 6739448, at *17 (E.D. Pa. Dec. 22, 2011); *CentiMark Corp. v. Jacobsen*, No. 11-1137,
2011 WL 5977668, at *16 (W.D. Pa. Nov. 29, 2011); *Hill v. Best Med. Intern., Inc.*, Nos. 07-1709,
08-1404, 09-1194, 2011 WL 5082208, at *17 (W.D. Pa. Oct. 25, 2011); *EXI Lab.'s, LLC v. Egolf*,
No. 10-6282, 2011 WL 880453, at *8 (E.D. Pa. Mar. 11, 2011); *Am. Bd. of Internal Med. v. Von
Muller*, No. 10-2680, 2011 WL 857337, at *10–11 (E.D. Pa. Mar. 10, 2011); *Giordano v. Claudio*,
714 F. Supp. 2d 508, 521–22 (E.D. Pa. 2010); *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d
378, 417–18 (E.D. Pa. 2009); *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 249 F. Supp. 2d 622,

by Pennsylvania courts involve some accusation of 'passing off' of one's own product as another, or a false or dishonest statement, or tortious interference with contract, or intellectual property theft." *Checker Cab*, 689 F. App'x at 709 (citation omitted); *see Centennial Lending Grp. v. Seckel Capital, LLC*, No. 822 EDA 2016, 2017 WL 4861625, at * 9 (Pa. Super. Oct. 26, 2017) (quoting *Pa. State Univ. v. Univ. Orthopedics, Ltd.*, 706 A.2d 863, 867 (Pa. Super. 1998)) ("A claim for unfair competition encompasses trademark infringement, but also includes a broader range of unfair practices, which may generally be described as a misappropriation of the skill, expenditures and labor of another.").

Because Pennsylvania's appellate courts have yet to set forth the underlying specifics of unfair competition claims, an unsettled question of state law remains as to the elements of the state tort. That being said, however, the Court need not delineate the precise contours of Pennsylvania unfair competition law at this time because the potential federal issues raised are those tailored to causation—an element implicitly and inherently present in all torts.[40] *See Univ. of Tex. Sw. Med.*

---

688 (E.D. Pa. 2003). For cases either declining to apply the Restatement (Third) of Unfair Competition or analyzing the claim without mentioning it, see *Checker Cab*, 689 F. App'x at 709; *Sandoz Inc. v. Lannett Co., Inc.*, No. 2021 WL 2473937, at *2 (E.D. Pa. Jun. 17, 2021); *Sandoz*, 2020 WL 7695960, at *6; *Liberty Mut. Ins. Co. v. Gemma*, 301 F. Supp. 3d 523, 545–46 (W.D. Pa. 2018); *AutoTrakk, LLC v. Auto. Leasing Specialists, Inc.*, No. 2017 WL 2936730, at *12–15 (M.D. Pa. Jul. 10, 2017); *Robson Forensic, Inc. v. Heiberg*, No. 16-1703, 2016 WL 3078960, at *3 (E.D. Pa. Jun. 1, 2016); *Bldg. Materials Corp. of Am. v. Rotter*, 535 F. Supp. 2d 518, 526 n.4 (E.D. Pa. 2008).

[40] At oral argument, the parties predominantly discussed causation-related inquiries pertinent to the Department of Commerce's discretion to grant or deny exclusion requests. *See* (ECF No. 1, ¶ 19) ("NLMK cannot establish any damages if [the Department of] Commerce properly denied the exclusion requests."); (ECF No. 28, p. 15) ("If I prove that truth, . . . then the next thing I must prove is that, given that truth, [the Department of] Commerce would have and should have . . . grant[ed] the exclusion request, and their failure to do so injured me, and that injury is attributable to . . . a substantial cause . . . ."); (ECF No. 18, p. 26) ("The effect of those objections, whether those would have changed NLMK's exclusion request, how [the Department of] Commerce weighed our objection versus their objections, those are all federal questions.").

*Ctr. v. Nassar*, 570 U.S. 338, 346 (2013) ("Causation in fact—*i.e.*, proof that the defendant's conduct did in fact cause the plaintiff's injury—is a standard requirement of any tort claim . . . ."); *Thompson & Phillips Clay Co. v. Dep't of Envtl. Res.*, 582 A.2d 1162, 1165 (Pa. Common. 1990) (agreeing that causation in a necessary element of all torts).  As U.S. Steel points out, the federal issues in this case surround causation—that is, the nature and scope of the Department of Commerce's discretion to grant or deny tariff exclusion requests, which necessarily requires not only the interpretation of governing federal regulations, but also a deep dive into the decision-making process of the Department of Commerce.[41]

Accordingly, the Court holds that federal issues are necessarily raised and actually disputed[42] because NLMK would be required to prove not only that there were false representations made by U.S. Steel to the Department of Commerce but that those false

---

[41] In addition to interpretation of federal law surrounding the discretion of the Department of Commerce, U.S. Steel also puts forth a number of federal questions relevant to a breach of duty—i.e., whether misrepresentations were actually made, including: (1) whether objectors may aggregate production capacities specified in different objections; (2) whether an objection is a commitment to produce a particular volume of steel slab; (3) whether an objection is a commitment to provide the slab to the competitor, and if so, whether certain conditions such as the price of sale attach; (4) whether the Department of Commerce evaluates exclusion requests individually or aggregately; and (5) whether an objection may be based on the ability to produce a substitute product.  (ECF No. 1, ¶¶ 21–23); (ECF No. 23, pp. 11–13).  These questions, however, while necessarily raised and disputed (ECF No. 19, p. 14); (ECF No. 23, pp. 12–13), do not appear to be substantial to our federal system as a whole because they would involve the application of factual circumstances to the governing federal regulations set forth in the Secretary's interim final rule. That is, these questions do not present the "something more" required for substantiality because they are backward-looking and fact-intensive analyses that state courts can handle by "hew[ing] closely to the pertinent federal precedents."  *Gunn*, 568 U.S. at 262.  In other words, unlike the causation inquiry, answering these questions does not involve the discretion or decision of the middle man—the Department of Commerce—because a court would not be concerned with whether the Department of Commerce believed there to be misrepresentations, but rather whether there were misrepresentations in fact.

[42] Indeed, at oral argument, the parties actually disputed the Department of Commerce's discretion to grant or deny tariff exclusion requests.  (ECF No. 28, pp. 8, 14–15, 22–27, 32, 41–42).

representations proximately caused the Department to reject NLMK's exclusion request.  This would necessarily require interpreting federal regulations surrounding the nature and scope of the Department of Commerce's discretion to grant or deny the tariff exclusion requests and, critically, its actual exercise of its authority in denying the exclusion requests—including its weighing of the requisite national security considerations.  There is no question, then, that the disposition of the critical causation element of NLMK's state-law claim will necessarily turn on some construction of federal law.

> **2)** **The Federal Issue Encountered in the Determination of NLMK's Claim Is Substantial to Our Federal System as a Whole and Adjudicating that Claim Will Not Disturb the Federal-State Balance.**

The Court's jurisdictional inquiry, however, does not end with the mere presence of federal issues in the underlying state law claim.  That is because "it is not enough that [a] federal issue be significant to the particular parties in the immediate suit; that will *always* be true when the state claim 'necessarily raises' a disputed federal issue . . . .  The substantiality inquiry under *Grable* looks instead to the importance of the issue to the federal system as a whole."  *Gunn*, 568 U.S. 260 (cleaned up).  The determination of substantiality is guided by a series of cases from the Supreme Court.

A century ago, the Supreme Court decided *Smith v. Kansas City Title & Trust Co.*, 255 U.S. 180 (1921), which has been described as the "classic example" of a state claim arising under federal law.  *Grable*, 545 U.S. at 312–13.  The action was brought by a shareholder of the Kansas City Title & Trust Company "to enjoin the company, its officers, agents and employees, from investing the funds of the company in farm loan bonds issued by Federal Land Banks or Joint-Stock Land Banks under authority of the Federal Farm Loan Act of July 17, 1916."  *Smith*, 255 U.S. at 195.  The plaintiff argued that the defendant-banks were prohibited from purchasing certain

federal bonds because they were issued under an unconstitutional law.  *Id.* at 198.  The Supreme Court held that it had federal question jurisdiction because "the controversy concern[ed] the constitutional validity of an act of Congress which [was] directly drawn in question[,] [and] [t]he decision depend[ed] upon the determination of th[at] issue."  *Id.* at 201.

In *Grable*, a state law action was brought by the plaintiff to quiet title to real property seized and sold by the Internal Revenue Service ("IRS").  *Grable*, 545 U.S. at 310–11.  There, the IRS seized Grable & Sons Metal Products' real property in Michigan to satisfy a federal tax delinquency.  *Id.* at 310.  In doing so, the IRS gave the required statutory notice of the seizure and sale, and although the plaintiff actually received both notices, the plaintiff did not exercise its statutory right to redeem the property within 180 days of the sale to the defendant.  *Id.* at 310–11.  After the property was sold to the defendant, the plaintiff brought a quiet title action in state court, arguing that the defendant's title was invalid "because the IRS failed to notify [the plaintiff] of its seizure of the property in the exact manner required by [26 U.S.C.] § 6335(a) . . . ."  *Id.*  The Supreme Court held that it had federal question jurisdiction because "[t]he Government has a strong interest in the 'prompt and certain collection of delinquent taxes,' and the ability of the IRS to satisfy its claims from the property of delinquents requires clear terms of notice to allow buyers like [the defendant] to satisfy themselves that the [IRS] has touched the bases necessary for good title."  *Id.* at 315 (quoting *United States v. Rodgers*, 461 U.S. 677, 709 (1983)).  Because it was clear that the IRS had "a direct interest in the availability of a federal forum to vindicate its own administrative action, . . . ." "[t]he meaning of the federal tax provision [was] an important issue of federal law that sensibly belong[ed] in a federal court."  *Id.*

In *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677 (2006), a private insurer sought reimbursement for the medical expenses incurred by a federal employee that were paid

under a government contract.  *Id.* 687–88.  That contract arose from the authority conferred to the Office of Personnel Management ("OPM") by the Federal Employees Health Benefits Act of 1959. *Id.* at 682.  The Act authorized the OPM to contract with private carriers to offer various health-care plans to federal employees.  *Id.*  The OPM contracted with the Blue Cross Blue Shield Association to provide health insurance benefits to federal employees.  *Id.* at 682–83.  After the administrator of a beneficiary's estate received a state-court settlement from various parties that allegedly caused the decedent's injuries, the insurance carrier filed suit in federal court seeking to recover from the settlement amounts paid for the decedent's medical expenses.  *Id.* at 683. Notably, the Act "contain[ed] no provision addressing the subrogation or reimbursement rights of carriers."  *Id.*  The Supreme Court held that the reimbursement claim did not arise under federal law and the case was "poles apart from *Grable*."  *Id.* at 700.  The Supreme Court provided that, unlike *Grable*—which "centered on the action of a federal agency (IRS) and its compatibility with a federal statute . . . ."—"the reimbursement claim was triggered not by the action of any federal department, agency, or service, but by the settlement of a personal injury action launched in state court . . . and the bottom-line practical issue [was] the share of that settlement properly payable to [the plaintiff]."  *Id.* (citation omitted).  The Supreme Court provided that resolving the reimbursement claim would be "fact-bound and situation specific[,]" in contrast with *Grable's* predominant issue of law.  *Id.* at 700–01.

In *Gunn*, Vernon Minton developed and leased a program and network designed to aid securities trading to R.M. Stark & Co., a brokerage firm.  *Gunn*, 568 U.S. at 253.  Minton was granted a patent, and he subsequently filed an infringement suit against the National Association of Securities Dealers, Inc., as well as the NASDAQ Stock Market, Inc.  *Id.* at 254.  That action was terminated because the "on sale" bar invalidated the patent due to the fact that the invention

was on sale for more than a year before the application (i.e., Minton leased the program to R.M.
Stark & Co. more than one year prior to filing). *Id.* Minton then brought an action against his
attorneys and argued that their "failure to raise the experimental-use argument earlier had cost him
the lawsuit and led to invalidation of his patent . . . ." *Id.* at 255. The attorneys responded that the
prior lease was not an experimental use, and as a result, his infringement claim would have failed
even if the argument was put forth earlier. *Id.* Minton lost that suit, and on appeal, argued that the
lower state court was without subject matter jurisdiction to adjudicate the malpractice claim. *Id.*
The Supreme Court held that the state-law claim did not arise under federal law because, although
there were federal issues raised and disputed, those issues were neither important nor substantial
to the federal system as a whole. This was due to the nature of the question posed: the causation
element asked "whether, had the argument been made, the outcome of the earlier litigation would
have been different." *Id.* at 259. The question was purely hypothetical: "*if* Minton's lawyers had
raised a timely experimental-use argument, would the result in the patent infringement proceeding
have been different?" *Id.* at 261. Answering that hypothetical would "not change the real-world
result of the prior federal patent litigation." *Id.* Allowing state courts to resolve those types of
cases would be inconsequential to federal law because "federal courts are of course not bound by
state court case-within-a-case patent rulings." *Id.* at 262. The results of the state court's
determination "would be limited to the parties and patents that had been before the state court[,]
[and] [s]uch 'fact-bound and situation-specific' effects are not sufficient to establish federal arising
under jurisdiction." *Id.* (quoting *Empire Healthchoice*, 547 U.S. at 701). The Court concluded
that regardless of the particular importance of the federal issue to the parties, something more is
required, which demonstrates "that the question is significant to the federal system as a whole . .
. ." *Id.* at 263.

That "something more" is present in this case.  Undoubtedly, there are some similarities between the circumstances of this case and those discussed in *Gunn*.  As NLMK points out, the causation inquiry would partially consist of the backward-looking and fact-intensive analysis that the Supreme Court warned of in *Gunn* and *Empire Healthchoice* because a court would be asking what the Department of Commerce would have done if faced with truthful representations on behalf of U.S. Steel.  Moreover, NLMK does not challenge the actions of the Department of Commerce *per se* or, for that matter, the legality of the federal laws and regulations governing the tariff exclusion process.  To that extent, it is also clear that a state court's incidental, hypothetical interpretation of any federal regulations would not be binding on either the United States Court of International Trade or the United States Court of Appeals for the Federal Circuit.

What sets this case apart, however, is that the primary question of law necessary to establish the causation prong of NLMK's action—i.e., the scope of the Secretary's and the Department of Commerce's discretion to grant or deny exclusion requests—is one that is created and regulated by federal statutes and regulations and would require a probing examination of the unsettled question of *why* the Department of Commerce denied NLMK's exclusion request.  Moreover, under the plain language of the regulatory framework, this question included a consideration of the impact of the determination on precious matters of national security.  Although NLMK does not technically purport to attack the decisions of the Department of Commerce denying tariff exclusions, a substantial—and critical—portion of the proceedings would essentially be focused on not only re-creating the thought-process of the Department of Commerce (which almost certainly would require the testimony of various high-ranking officials of the United States), but second-guessing its decision by examining the weight it gave to U.S. Steel's alleged misrepresentations and the other factors it was required to consider.  This exercise is uniquely and

entirely federal in character.  Additionally, if it were to be the case that misrepresentations were made that caused the Department of Commerce to deny the exclusions, a jury's partial compensatory award of the requested portion of the tariff payments ordered by the Secretary and paid by NLMK would vitiate the Secretary's prior decisions and substitute the Secretary's judgment for that of twelve citizens.[43]  The nature and scope of the Secretary's discretion to grant or deny exclusion requests is an important issue of federal law that is vital to our country's national security, and the Department of Commerce, and by extension both the President and Congress, have strong interests at stake that indicate "a serious federal interest in claiming the advantages thought to be inherent in a federal forum."  *Grable*, 545 U.S. at 313.  The Court is therefore satisfied that the necessarily raised and disputed nature of the Secretary's discretion to grant or deny exclusion requests is a substantial question of federal law to our system as a whole, which "sensibly belongs in a federal court."  *Id.* at 315.

The Court is also satisfied that adjudicating this case will not disturb the federal-state balance approved by Congress because "[n]ational security and foreign policy are core matters of

---

[43] It is undisputed that NLMK seeks to recoup a portion of the tariffs it was ordered to pay by the Department of Commerce.  *See* (ECF No. 1-2, ¶ 90) ("As a result of U.S. Steel's dishonest and unfair behavior, NLMK was wrongly forced to pay substantial tariffs from which it was entitled to exclusions, which negatively impacted NLMK's ability to compete with U.S. Steel, interfered with NLMK's business relationships and caused NLMK to sustain significant disruption and harm to its business, including lost profits, lost contracts, and lost investment opportunities.").  Indeed, at oral argument, NLMK confirmed the same.  *See* (ECF No. 28, p. 13) ("We were damaged by what U.S. Steel did.  It was a tort.  It was designed to inhibit our competitive ability, and it did that, and it did that in a variety of ways.  One way was we had to pay a tariff.  But the other ways, which the [Court of International Trade] could not solve and [the Department] of Commerce could not solve, is we lost profits; we had increased costs; we lost business we couldn't do; and we had to put a major capital expansion on the shelf because we were spending money here that we didn't have for there."); (ECF No. 24, p. 8) ("[i]f U.S. Steel were ordered to pay NLMK damages, it would be for *all* the damage that U.S. Steel caused to NLMK's business, not just for the tariffs paid."); (ECF No. 24, p. 9) ("The fact that a portion of those damages relates to the tariffs that NLMK was forced to pay is irrelevant and certainly has nothing to do with establishing federal jurisdiction.").

legitimate federal concern . . . ." *Fed. Express Corp. v. U.S. Dep't of Commerce*, 486 F. Supp. 3d 69, 76 (D.D.C. 2020) (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010)); *see also Chamber of Commerce of U.S. v. Whiting*, 563 U.S. 582, 604 (2011) (listing cases discussing presidential foreign policy and foreign affairs, as well as fraud, on a federal agency as matters of federal concern); *Hamdi v. Rumsfeld*, 542 U.S. 507, 580 (2004) (Thomas, J., dissenting) (first quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981), then citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 662 (1952) (Clark, J., concurring)) ("'It is "obvious and unarguable" that no governmental interest is more compelling than the security of the Nation.'  The national security, after all, is the primary responsibility and purpose of the Federal Government."); *Japan Line, Ltd. v. Los Angeles Cnty.*, 441 U.S. 434, 448 (1979) (quoting *Bd. of Trustees v. United States*, 289 U.S. 48, 59 (1933)) ("Foreign commerce is pre-eminently a matter of national concern.  'In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power.'") (internal quotation marks omitted).  Seeing that typical unfair competition claims between businesses do not concern either the decision of the Department of Commerce or the interpretation of federal regulations concerning various Presidential Proclamations, "federal jurisdiction . . . will portend only a microscopic effect on the federal-state division of labor."  *Grable*, 545 U.S. at 315 (citation omitted).

For these reasons, the Court holds that it has federal question jurisdiction to adjudicate NLMK's state-law unfair competition claim under *Grable* because the claim necessarily raises and actually disputes a substantial question to our federal system as a whole—the scope and nature of the Secretary's discretion to grant or deny tariff exclusion requests—the resolution of which will not disturb the federal-state balance authorized by Congress.

### III.    CONCLUSION

For the reasons set forth above, the Court will deny NLMK's Motion to Remand (ECF

No. 18).  An Order of Court will follow.

BY THE COURT:


s/    William S. Stickman IV
WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

August 19, 2021
Dated