IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NLMK PENNSYLVANIA, LLC and NLMK
INDIANA, LLC

                    *Plaintiffs,*

        v.

UNITED STATES STEEL CORPORATION,

                    *Defendant.*

Civil Action No. 2:21-cv-273

Hon. William S. Stickman IV

## **OPINION**

WILLIAM S. STICKMAN IV, United States District Judge

### I.    **INTRODUCTION**

Congress empowers the Secretary of Commerce, in conjunction with the President of the United States and the Secretary of Defense, to investigate the impact of foreign imports on the national security of the United States. If that impact is found to be harmful, the President is authorized to impose a tariff on designated imported goods. After such an investigation, in 2017, President Donald J. Trump imposed a 25% tariff on certain imported steel products. Under the rules implementing the tariff, an impacted company could request an exemption from the tariff, and domestic producers could then object to the exemption request. That is what happened here. Plaintiffs NLMK Pennsylvania, LLC, and NLMK Indiana, LLC (collectively "NLMK"), requested exemptions from the tariff and, in response, Defendant United States Steel Corporation ("U.S. Steel") objected to every request. After the Department of Commerce ("Commerce") ruled in favor of U.S. Steel's objections, NLMK lodged an appeal pursuant to the designated procedure.

1

NLMK received a $97 million dollar refund under a settlement approved by the United States Court of International Trade. *NLMK Indiana LLC v. United States*, Ct. Int'l Trade, No. 1:20-cv-00050.

Claiming that it was not made completely whole through Commerce's appeal process, NLMK filed a one-count Complaint in the Court of Common Pleas of Allegheny County, Pennsylvania, on January 22, 2021, asserting a state-law unfair competition claim. (ECF No. 1-2). The Complaint alleges that NLMK submitted exclusion requests to Commerce and that U.S. Steel engaged in unfair competition by making various misrepresentations to Commerce during its evaluation. NLMK contends that these misrepresentations resulted in the wrongful imposition of tariffs on its products, which caused direct and indirect economic damages. In other words—NLMK claims that U.S. Steel lied in its objections to the exemption requests to harm NLMK, its competitor, and that U.S. Steel's lies are actionable under Pennsylvania common law.

U.S. Steel removed the case to the United States District Court for the Western District of Pennsylvania on February 25, 2021 (ECF No. 1), and the Court found removal to be proper on August 18, 2021, when it denied NLMK's motion to remand. (ECF Nos. 34, 35). U.S. Steel has now moved to dismiss NLMK's unfair competition claim under Federal Rule of Civil Procedure ("Rule") 12(b)(6). (ECF No. 39). U.S. Steel argues that NLMK's Complaint does not assert a cognizable substantive claim because no Pennsylvania case has applied the unfair competition claim cause of action to a situation remotely similar to the one here—to make actionable alleged misrepresentations to government regulators or other public officials. But even if the claim is actionable, U.S. Steel argues that there are multiple legal impediments to recovery, including federal preemption, immunity under the federal *Noerr-Pennington* doctrine and judicial immunity under Pennsylvania law.

For the reasons explained below, the Court will dismiss NLMK's Complaint. It is skeptical that NLMK has asserted a cognizable claim under Pennsylvania's common law of unfair competition. Even if it had, NLMK's state law claim is preempted by the broad Constitutional and statutory grant of power over national security, foreign trade and foreign relations to the federal government. In this case, the statutory and administrative framework governing the imposition of the tariff and the process for adjudicating an exemption request is so pervaded by critical federal interests that it leaves no room for state involvement. Preemption bars NLMK's state law unfair competition claim.

## II.   BACKGROUND

### A.   Statutory and Administrative Background

Under Section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (1962) (codified as amended at 19 U.S.C. § 1862) (hereinafter Section 232), Congress authorized and empowered the President, upon receipt and agreement with specific findings of an executive officer, to take actions necessary to address national security threats posed by imported goods. Under the statute, upon receiving a "request of the head of any department or agency, upon application of an interested party, or upon his own motion," the Secretary of Commerce must "initiate an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion." 19 U.S.C. § 1862(b)(1)(A). At the same time, "the Secretary [of Commerce] shall immediately provide notice to the Secretary of Defense of any investigation initiated . . . ." 19 U.S.C. § 1862(b)(1)(B). The Secretary of Commerce's investigation is informed and advised by various officers of the United States—most notably the Secretary of Defense on "methodological and policy questions"—and "if it is appropriate and after reasonable notice, [the Secretary shall] hold public hearings or otherwise

afford interested parties an opportunity to present information and advice relevant to [the] investigation." 19 U.S.C. § 1862(b)(2)(A)(i)–(iii).

Upon completion of the investigation, the Secretary of Commerce must submit a report detailing the findings "with respect to the effect of the importation of such article in such quantities or under such circumstances upon national security" and provide recommendations for action or inaction of the President. 19 U.S.C. § 1862(b)(3)(A). Further, if the Secretary of Commerce determines that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall so advise the President in such report." *Id.* Thereafter, the President shall "determine whether [he] concurs with the finding of the Secretary, and if the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A)(i)–(ii).

Congress also provided various considerations that both the President and the Secretary of Commerce must consider in making their determinations:

> the Secretary and the President shall, in the light of the requirements of national security and without excluding other relevant factors, give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and the capacity of the United States to meet national security requirements. In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic

products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

19 U.S.C. § 1862(d).

The specific tariffs underlying the dispute in this case arose after the Secretary of Commerce initiated an investigation to determine the effects of steel imports on national security on or about April 26, 2017.[1]  The Secretary of Commerce notified the United States Secretary of Defense, James N. Mattis, of his "investigation to determine the effects of imported steel on national security."[2]  President Trump then requested an expeditious investigation, with considerations and recommendations concerning the nation's security.[3]

Upon finishing his investigation, the Secretary of Commerce sent his report to the President.[4]  The Secretary of Commerce found that domestic steel production was essential to national security, and more specifically, that the importation of foreign flat, long, semi-finished, pipe and tube, and stainless steel were adversely impacting both national security and the steel industry.[5]  He found that "the present quantities and circumstance of steel imports are 'weakening

---

[1] Notice Request for Public Comments and Public Hearing on Section 232 National Security Investigation of Imports of Steel, 82 Fed. Reg. 19,205, 19,205 (Apr. 26, 2017).

[2] Letter from the Secretary of Commerce to the Secretary of Defense (Apr. 19, 2017) (on file with the Department of Commerce).

[3] Administrative Memorandum from Administration of Donald J. Trump to the Secretary of Commerce on Steel Imports and Threats to National Security DCPD201700259 (Apr. 20, 2017) (on file with the Government Publishing Office).

[4] Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended, 85 Fed. Reg. 40,202, 40,202 (Jul. 6, 2020) (hereinafter Steel Report); *see also* Adjusting Imports of Steel Into the United States, Proclamation 9705 of March 8, 2018, 83 Fed. Reg. 11,625, 11,625 (Mar. 8, 2018) (hereinafter Proclamation 9705).

[5] Steel Report at 40,204.

our internal economy' and threaten to impair the national security as defined in Section 232."[6]  The Secretary of Commerce highlighted that "[n]umerous U.S. steel mill closures, a substantial decline in employment, lost domestic sales and market share, and marginal annual net income for U.S.-based steel companies illustrate the decline of the U.S. steel industry."[7]  Excessive imports were further reducing U.S. steel production capacities to an economically unsustainable position.[8]  The Secretary of Commerce determined that U.S. steel producers would "face increasing competition from imported steel as other countries export more steel to the United States to bolster their own economic objectives and offset loss of markets to Chinese steel exports."[9]  He concluded "that the only effective means of removing the threat of impairment is to reduce imports to a level that should, in combination with good management, enable U.S. steel mills to operate at 80 percent or more of their rated production capacity."[10]

To accomplish that goal, the Secretary of Commerce presented two options.  The first was for the  President to impose either a global quota limiting steel imports to 63% of 2017 imports or a global tariff of 24% on all steel imports.[11]  The second was for the President to impose a 53% tariff on Brazil, South Korea, Russia, Turkey, India, Vietnam, China, Thailand, South Africa, Egypt, Malaysia and Costa Rica, as well as limit imports from other countries to their 2017 levels.[12]

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] *Id.* at 40,205.

[12] *Id.*

The Secretary of Commerce recommended that the President consider an exemption process from the options above premised "on an overriding economic or security interest of the United States." [13]  He additionally recommended "an appeal process by which affected parties could seek an exclusion from the tariff or quota imposed."[14]  Under that process, the Secretary of Commerce "would grant exclusions based on a demonstrated: (1) lack of sufficient U.S. production capacity of comparable products; or (2) specific national security[-]based considerations."[15]  If an exclusion was granted, the Secretary of Commerce "would consider at the time whether the quota or tariff for the remaining products needs to be adjusted to increase U.S. steel capacity utilization to a financially viable target of 80 percent."[16]

The President agreed with the findings of the Secretary of Commerce, and after considering the recommendations, initially elected "to adjust the imports of steel articles by imposing a 25 percent ad valorem tariff on steel articles . . . imported from all countries except Canada and Mexico."[17]  The President authorized Commerce to exclude certain steel articles from the imposition of tariffs where those articles are "determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality and [Commerce] is also authorized to provide such relief based upon specific national security considerations."[18]  The President also ordered the Secretary of Commerce to continually monitor steel imports, consult

---

[13] *Id.*

[14] *Id.* at 40,206.

[15] *Id.*

[16] *Id.*

[17] Proclamation 9705 at 11,626.

[18] *Id.* at 11,627.

various officials, review imports for national security and inform the President of any circumstances requiring further actions or circumstances indicating the duty rate is no longer necessary.[19]

Commerce subsequently published an interim final rule interpreting Proclamation 9705 and establishing the procedures and methods for obtaining exclusions from the imposition of tariffs on certain steel articles.[20]  Under that rule, "directly affected individuals or organizations located in the United States may submit an exclusion request."[21]  "An individual or organization is 'directly affected' if they are using steel in business activities (e.g., construction, manufacturing, or supplying steel product to users) in the United States."[22]  Individuals or organizations are required to submit exclusion requests, objections to exclusion requests, rebuttals, and surrebuttals to an online web portal.[23]

Commerce requires separate exclusion requests to be submitted for steel products (including products falling into more than one ten-digit Harmonized Tariff Schedule of the United States ("HTSUS") statistical reporting number) "with chemistry by percentage breakdown by weight, metallurgical properties, surface quality (e.g., galvanized, coated), and critical dimensions

---

[19] *Id.* at 11,628.  The President subsequently issued a number of Proclamations adjusting tariffs, quotas and exemptions for various countries.  The substance of those Proclamations, however, is not material here.

[20] *See generally* Requirements for Submissions Requesting Exclusions from the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum, 83 Fed. Reg. 12,106, 12,110 (Mar. 19, 2018) (currently codified at 15 C.F.R. pt. 705, Supp. 1 (2020)).

[21] 15 C.F.R. pt. 705, Supp. 1, ¶ (c)(1).

[22] *Id.*

[23] *Id.* at ¶ (b).

covered by a common HTSUS statistical reporting number."[24]   Commerce "will approve
exclusions on a product basis, and the approvals will be limited to the individual or organization
that submitted the specific exclusion request, unless Commerce approves a broader application . .
. ."[25] Each exclusion request must "specify the business activities in the United States within which
the requester is engaged that qualify the individual or organization to be directly affected and thus
eligible to submit an exclusion request."[26]   Each request "should clearly identify, and provide
support for, the basis upon which the exclusion is sought."[27]   "An exclusion will only be granted
if an article is not produced in the United States in a sufficient and reasonably available amount,
is not produced in the United States in a satisfactory quality, or for specific national security
considerations."[28]

The interim final rule made provisions for third parties to object to exclusion requests.  Any
objections submitted in opposition to exclusion requests must:

> clearly identify, and provide support for, its opposition to the proposed exclusion,
> with reference to the specific basis identified in, and the support provided for, the
> submitted exclusion request.  If the objector is asserting that it is not currently
> producing the steel or aluminum identified in an exclusion request but can produce
> the steel or aluminum and make that steel or aluminum available "immediately" in
> accordance with the time required for the user of steel or aluminum in the United
> States to obtain the product from its foreign suppliers, the objector must identify
> how it will be able to produce and deliver the quantity of steel or aluminum needed
> either within eight weeks, or if after eight weeks, by a date which is earlier than the
> named foreign supplier would deliver the entire quantity of the requested
> product.  It is incumbent on both the exclusion requester, and objecting producers,
> to provide supplemental evidence supporting their claimed delivery times.  This

---

[24] *Id.* at ¶ (c)(2).

[25] *Id.*

[26] *Id.* at ¶ (c)(5).

[27] *Id.*

[28] *Id.*

requirement includes specifying in writing to the Department of Commerce as part of the objection, the timeline the objector anticipates in order to start or restart production of the steel included in the exclusion request to which it is objecting.[29]

After the submission process is complete (including the submission of any remaining rebuttals or surrebuttals), Commerce "reviews the complete exclusion requests to determine whether the article described in the request meet[s] any of three criteria, namely 'the article is not produced in the United States in a sufficient and reasonably available amount, is not produced in the United States in a satisfactory quality, or for specific national security concerns.'" *JSW Steel*, 466 F. Supp. 3d at 1324 (quoting 15 C.F.R. pt. 705, Supp. 1, ¶¶ (c)(6), (h)(2)).[30] Commerce defines both quantity and quality as follows:

> The exclusion review criterion "Not produced in the United States in a sufficient and reasonably available amount" means that the amount that is needed by the end user requesting the exclusion is not available immediately in the United States to meet its specified business activities. Available "immediately" means that a product (whether it is currently being produced in the United States, or could be produced in the United States) can be delivered by a U.S. producer "within eight weeks," or, if that is not possible, by a date earlier than the time required for the requester to obtain the entire quantity of the product from the requester's foreign supplier. Furthermore, to the extent that an objector can produce and deliver a portion, which is less than 100 percent, but ten percent or more, of the amount of steel or aluminum needed in the business activities of the user in the United States described in the exclusion request, the Department of Commerce may deny a requested exclusion for that percentage of imported steel or aluminum. It is

---

[29] *Id.* at ¶ (d)(4).

[30] Although Commerce has since amended its original interim final rule, the substantive process remains the same. Commerce may grant exclusions "to 'directly affected individuals or organizations located in the United States . . . . [who use steel or aluminum] in business activities' and [it] retain[s] 'the discretion to make exclusion requests available to all importers if [it] find[s] the circumstances so warrant.'" *Thyssenkrupp Materials NA Inc. v. United States*, 498 F. Supp. 3d 1372, 1376 n.1 (C.I.T. 2021) (citing various amendments to the interim final rule); *see also* Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and Aluminum, 83 Fed. Reg. 46,026, 46,048–46,053 (Sept. 11, 2018); Implementation of New Commerce Section 232 Exclusions Portal, 84 Fed. Reg. 26,751, 26,753, 26,757–26,760 (Jun. 10, 2019); Section 232 Steel and Aluminum Tariff Exclusions Process, 85 Fed. Reg. 81,060, 81,069–81,071 (Dec. 14, 2020).

incumbent upon both the exclusion requester, and objecting producers, to provide supplemental evidence supporting their claimed delivery times.

* * *

The exclusion review criterion "not produced in the United States in a satisfactory quality" does not mean the steel or aluminum needs to be identical, but it does need to be equivalent as a substitute product. "Substitute product" for purposes of this review criterion means that the steel or aluminum being produced by an objector can meet "immediately" (see paragraph (c)(6)(i) of this supplement) the quality (e.g., industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S.-produced steel to be used in that business activity in the United States by that end user.[31]

In addition to the determination of whether a product is produced in the United States in a sufficient and reasonable quantity and to an acceptable level of quality, the Secretary of Commerce is required to make a separate determination on the national security implications of each exclusion request:

The exclusion review criterion "or for specific national security considerations" is intended to allow the U.S. Department of Commerce, in consultation with other parts of the U.S. Government as warranted, to make determinations whether a particular exclusion request should be approved based on specific national security considerations.[32]

Commerce will typically issue its decision within 106 days of the exclusion request being posted to the online portal, and Commerce "will grant properly filed exclusion requests which meet the requisite criteria, receive no objections, and present no national security concerns."[33] If no objections are submitted, the Bureau of Industry and Security "will immediately assess the request for any national security concerns."[34] If the Bureau of Industry and Security "identifies no

---

[31] 15 C.F.R. pt. 705, Supp. 1, ¶¶ (c)(6)(i)–(ii).

[32] *Id.* at ¶¶ (c)(6)(iii).

[33] *Id.* at ¶¶ (h)(2)(ii), (h)(3)(i).

[34] *Id.* at ¶ (h)(2)(ii).

national security concerns, it will post a decision granting the exclusion request in the . . . [p]ortal."[35]

## B.      Factual Background

NLMK supplies steel sheet and coil to the construction, automotive, pipe and tube, and heavy equipment industries.  (ECF No. 1-2, ¶ 21).  NLMK and U.S. Steel directly compete with one another for customers in various markets, including pipe and tube, service center, yellow goods, agricultural, construction and coated conversion products.  (ECF No. 1-2, ¶ 12).  To fulfill the orders of customers, NLMK typically imports ten-inch and eight-inch steel slab feedstock to construct finished products.  (ECF No. 1-2, ¶¶ 13, 22–23, 29–30).  NLMK has limited capacity to produce eight-inch slab, and only one domestic producer is capable of producing ten-inch slab— ArcelorMittal—which retains all of its ten-inch slab in furtherance of its own operations.  (ECF No. 1-2, ¶¶ 23, 29–30).

NLMK alleges that, seeking to exploit its need for imported steel slab, "U.S. Steel hatched a scheme to prevent its competitors from obtaining . . . tariff exemptions . . . . forc[ing] NLMK to pay unwarranted tariffs, thereby driving up NLMK's costs, unfairly limiting its ability to . . . participate in the market, . . . meet contractual obligations to . . . its customers, . . . maintain sales volume[,] . . . compete with U.S. Steel on price[,] . . . and make substantial investments to increase its capacity . . . ."  (ECF No. 1-2, ¶ 46).  NLMK alleges that U.S. Steel "objected to every one of NLMK's requests covering steel slab from both Russia and Brazil."  (ECF No. 1-2, ¶ 36).

NLMK claims that U.S. Steel's objections to its exclusion requests for ten-inch steel slab included various fraudulent misrepresentations to Commerce, including: (1) falsely answering that it manufactured, or could manufacture within eight weeks, ten-inch steel slab; (2) falsely

_____

[35] *Id.*

answering that it could supply one hundred percent of NLMK's tonnage requirements in a timely manner; (3) falsely representing that it could sufficiently satisfy NLMK's orders for ten-inch steel slab; (4) falsely indicating that it is capable of producing ten-inch steel slab; (5) falsely providing that it could make an identical product in place of ten-inch steel slab; and (6) falsely representing that it engaged in multiple exchanges and proposals with NLMK for the sourcing of ten-inch steel slab. (ECF No. 1-2, ¶¶ 50–67). U.S. Steel's objections to NLMK's exclusion requests for eight-inch steel slab allegedly included false representations to Commerce that it was able to manufacture and supply all of the volume cited in the exclusion requests and that it had capacity to supply those amounts. (ECF No. 1-2, ¶ 68).

NLMK avers that the above representations were false because, among other things, U.S. Steel is neither capable of producing ten-inch steel slab, nor has it sold ten-inch steel slab to anyone. (ECF No. 1-2, ¶ 57). Moreover, NLMK avers that U.S. Steel never had the capacity to produce the eight-inch steel slab quantities specified in NLMK's exclusion requests because U.S. Steel was not operating at full capacity because of planned outages at its facilities—potentially stemming from unplanned outages and product delays—and even if it could operate at full capacity (normally steel mills max out at eighty to eighty-five percent capacity), its production capacity would represent roughly one percent of the domestic market—far less than required by NLMK's exclusion requests. (ECF No. 1-2, ¶¶ 74–76). U.S. Steel's capability of producing and supplying sufficient quantities of eight-inch steel slab is allegedly substantiated because U.S. Steel announced, during the relevant time, that it was going to be importing steel articles from its facilities in Europe to finish its own products. (ECF No. 1-2, ¶¶ 77–79).

NLMK avers that U.S. Steel's false representations to Commerce resulted in the unfair denial of tariff exclusion requests for ten-inch and eight-inch steel slab. (ECF No. 1-2, ¶ 81). It

claims that due to those increased trade costs, "NLMK's costs have been artificially inflated, impeding its ability to compete for new business . . . ." (ECF No. 1-2, ¶ 82). That includes a planned capital investment of more than $680 million to expand facilities and increase capacities, cancellation of contracts with customers, and the idling of approximately 550 steelworkers in Western Pennsylvania. (ECF No. 1-2, ¶¶ 82–84).

Based on its allegations relating to U.S. Steel's misrepresentations, NLMK brought a single cause of action for "unfair competition" under Pennsylvania law, requesting compensatory and punitive damages alleging that U.S. Steel knowingly and willfully made misrepresentations to Commerce to secure denials of numerous tariff exclusion requests, and those denials resulted in the unfair interference and obstruction with NLMK's business relationships, as well as its ability to competitively compete in the steel market. (ECF No. 1-2, ¶¶ 86–90).

### III.   STANDARD OF REVIEW

A motion to dismiss filed under Rule 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). A plaintiff must allege sufficient facts that, if accepted as true, state a claim for relief plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must accept all well-pleaded factual allegations as true and view them in the light most favorable to a plaintiff. *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009); *see also DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 262–63 (3d Cir. 2008). Although a court must accept the allegations as true, it is "not compelled to accept unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007) (citations omitted).

The "plausibility" standard required for a complaint to survive a motion to dismiss is not akin to a "probability" requirement but asks for more than sheer "possibility." *Iqbal*, 556 U.S. at

678 (citing *Twombly*, 550 U.S. at 556). In other words, the complaint's factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations are true even if doubtful in fact. *Twombly*, 550 U.S. at 555. Facial plausibility is present when a plaintiff pleads factual content that allows a court to draw the reasonable inference that a defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. Even if the complaint's well-pleaded facts lead to a plausible inference, that inference alone will not entitle a plaintiff to relief. *Id.* at 682. The complaint must support the inference with facts to plausibly justify that inferential leap. *Id.*

### IV.   ANALYSIS

**A.      Whether NLMK has pled a viable unfair competition claim is unclear in light of the current state of Pennsylvania law.**

NLMK's Complaint asserts a single cause of action—unfair competition under Pennsylvania common law. U.S. Steel moves to dismiss NLMK's claim, arguing that, as a threshold matter, it fails to plead a recognized cause of action or, more correctly, the cause of action it asserts does not apply to the facts pled.

NLMK argues that Pennsylvania's common law tort of unfair competition applies to the situation underlying its claim. It contends that Pennsylvania courts will permit an unfair competition claim to compensate for harm caused by "the misappropriation for the commercial advantage of one person of a benefit … belonging to another." *See e.g., Miracle Indus., Inc. v. Getty Petroleum Corp.*, 1992 WL 121723, at *4 (E.D. Pa. May 20, 1992); *see also Testing Sys., Inc. v. Magnaflux Corp.*, 251 F. Supp. 286, 289 (E.D. Pa. 1966). (ECF No. 47, p. 12). NLMK also argues that even if U.S. Steel's conduct raised a novel factual basis for an unfair competition claim under Pennsylvania law, dismissal would be inappropriate because this court can develop the common law tort by applying it to novel situations—such as U.S. Steel's alleged misconduct.

In other words, NLMK asks the Court to essentially predict that Pennsylvania courts would apply the unfair competition cause of action to U.S. Steel's conduct. It contends that in Pennsylvania, when there is an unsettled question of law, courts decline to dismiss the case if there is "case law supporting the prediction that the Pennsylvania Supreme Court would recognize [the] claim[.]" *Id.*

U.S. Steel argues that NLMK's complaint would require the Court to create a new type of unfair competition claim under Pennsylvania law. (ECF No. 40, p. 10). U.S. Steel posits that the United States Court of Appeals for the Third Circuit cautions that district courts should not be too bold in making the *Erie* guess in areas of unsettled state law and that federal courts must look at the current contours of state law, and "should be reluctant to expand the common law." *Lexington Nat. Ins. Corp. v. Ranger Ins. Co.*, 326 F.3d 416, 420 (3d Cir. 2003). (ECF No. 55, p. 6). U.S. Steel also argues that the Court ought not "act as a judicial pioneer" when applying state law and instead must "permit state courts to decide whether and to what extent they will expand state common law." *Leo v. Kerr-McGee Chem. Corp*, 37 F.3d 96, 101 (3d Cir. 1994). (ECF No. 55, p. 6).

Unfair competition has not been firmly defined by Pennsylvania courts and they have struggled to determine to which sorts of situations it will apply. In *Checker Cab Philadelphia, Inc. v. Uber Techs., Inc.*, 689 F. App'x 707 (3d Cir. 2017), the Third Circuit recently observed the confused state of Pennsylvania unfair competition law:

> We have noted that the contours of Pennsylvania unfair competition law are not entirely clear. *See Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 319 (3d Cir. 1995); *see also Giordano v. Claudio*, 714 F.Supp.2d 508, 521 (E.D. Pa. 2010). But *all* unfair competition claims recognized by Pennsylvania courts involve some accusation of "passing off" of one's own product as another, or a false or dishonest statement, or tortious interference with contract, or intellectual property theft. *See Peek v. Whittaker*, 2014 WL 2154965, at *10 (W.D. Pa. May 22, 2014) ("[Unfair competition] contextually is limited to claims designed

to protect a business from another's misappropriation of its business organization or its expenditure of labor, skill, or money...." (quotation and citation omitted)); *see also Granite State*, 57 F.3d at 319. Here, Checker has only alleged violation of state licensing regulations for taxi cabs as unfair competition. This in no way resembles the unfair competition claims recognized by Pennsylvania courts.

In *Peek v. Whittaker*, 2014 WL 2154965 (W.D.Pa. May 22, 2014), United States District Judge Mark R. Hornak summarized different types of conduct to which Pennsylvania courts applied the cause of action:

> At Pennsylvania common law, unfair competition is customarily defined as "the 'passing off of a rival's goods as one's own." *Giordano v. Claudio*, 714 F.Supp.2d 508, 521 (E.D.Pa.2010) (citing *Scanvec Amiable Ltd. v. Chang*, 80 Fed. Appx. 171, 180 (3d Cir.2003)). However, unfair competition is not limited to that definition. *Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy*, 415 Pa. 276, 203 A.2d 469, 473 (Pa.1964), Instead, "Pennsylvania courts have recognized a cause of action for the common law tort of unfair competition where there is evidence of, among other things, trademark, trade name, and patent rights infringement, misrepresentation, tortious interference with contract, improper inducement of another's employees, and unlawful use of confidential information." *Synthes (U.S.A.) v. Globus Med., Inc.*, 2005 WL 2233441, at *8 (E.D.Pa. Sept.14, 2005) (citations omitted). "The phrase contextually is limited to claims designed to protect a business from another's misappropriation of its business organization or its expenditure of labor, skill, or money, i.e., injury to reputation, product, manner of doing business, identification and so forth." *USX Corp. v. Adriatic Ins. Co.*, 99 F.Supp.2d 593, 620 (W.D.Pa.2000) (citing *Granite State Ins. Co. v. Aamco Transmissions, Inc.*, 57 F.3d 316, 320 (3d Cir.1995)). **Unfair competition may not be used as "a virtual catch-all for any form of wrongful business conduct."** *Id.* at 619.

*Peek* at *10 (emphasis added).

Under Pennsylvania unfair competition law, the cause of action evades a single definition susceptible to distillation into universally applied elements. However, none of the cases cited by NLMK and none located by the Court are remotely similar to NLMK's claim here. None arise from one competitor making alleged misstatements about *its own products or business* to a non-consumer, much less to a government regulator, resulting in the imposition of some detriment to its competitor and/or its competitor's products. At oral argument, the Court asked NLMK if it could identify a single Pennsylvania-law case arising from these circumstances. It identified only

*American Home Products Corp. v. Johnson & Johnson Corp.*, 1994 WL 46522 (Feb. 15, 1994).
(ECF No. 54, pp. 2-3). This case—an unpublished memorandum opinion denying a motion for a
new trial—is far from convincing. It suggests that the trial court permitted an unfair competition
claim based upon the alleged filing of a patent infringement action in bad faith to go to the jury.
But the opinion does not specify that the claim was asserted under Pennsylvania law. An
examination of the unpublished decision of the United States Court of Appeals for the Federal
Circuit reviewing the case on appeal offers no deeper insight. Neither opinion supports a
contention that the Pennsylvania tort may encompass the type of conduct at issue here. The fact
that *American Home Products* is the only case from a court sitting in Pennsylvania that NLMK
was able to identify only highlights the lack of authority supporting the extension of the
Pennsylvania unfair competition claim to U.S. Steel's alleged conduct here.

NLMK argues that even if Pennsylvania law has not yet expressly extended the unfair
competition cause of action to the conduct at issue here, the Court may do so through the common
law process. In *Checker Cab Philadelphia*, the Third Circuit observed the confused state of
Pennsylvania unfair competition law and expressed reluctance to extend it by predicting that the
Pennsylvania Supreme Court would not adopt the formulations of the claim outlined in the
Restatement (Third) of Unfair Competition:

> Unsurprisingly, Checker urges that we expand the definition of unfair
> competition. More specifically, it argues that we should "forecast" that the
> Pennsylvania Supreme Court *would* embrace a Restatement (Third) of Unfair
> Competition (1995) definition. It claims that the Restatement (Third) definition
> would bring the alleged regulatory violations under the umbrella of unfair
> competition.
> We disagree that the Supreme Court would embrace the Restatement
> (Third) of Unfair Competition as setting forth the Pennsylvania law. The
> Pennsylvania Supreme Court has in fact said it is "difficult to imagine a modern
> court simply adopting something so broad-based and legislative in character as an
> outside organization's Restatement of Law." *Tincher v. Omega Flex, Inc.*, 628 Pa.
> 296, 104 A.3d 328, 353 (2014). Furthermore, *no* Pennsylvania appellate court has

18

embraced a Restatement (Third) definition of unfair competition. *See Bldg. Materials Corp. of Am. v. Rotter*, 535 F.Supp.2d 518, 526 n.4 (E.D. Pa. 2008).

In this case, the Court is similarly hesitant to blaze new trails for Pennsylvania's unfair competition law. NLMK's claim is of a categorically different nature vis-à-vis the conduct alleged than the existing body of caselaw where Pennsylvania courts have applied the tort. The Court is skeptical, therefore, that Pennsylvania courts would extend the unfair competition cause of action to the conduct of U.S. Steel alleged in the Complaint. Ultimately, however, the Court is not required to decide the merits of this unsettled issue of state law. As explained below, *even if* NLMK had asserted a viable state-law claim, it would be barred by federal law. Thus, out of respect for the authority of Pennsylvania courts over the development of the common law of the Commonwealth, the Court will refrain from unnecessarily making a substantive call on this issue.

### B.    NLMK's state law cause of action is preempted by federal law.

Under the Supremacy Clause of the United States Constitution, "the Laws of the United States…shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. Therefore, when state and federal laws conflict, federal law preempts state law. *Altria Grp. Inc. v. Good*, 555 U.S. 70, 76 (2008). There are three ways by which federal law may preempt state law: (1) express preemption, (2) field preemption, and (3) conflict preemption. *Farina v. Nokia*, 625 F.2d 97, 115 (3d Cir. 2010). The Third Circuit defined the three types of preemption as follows:

> Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. Field preemption applies where the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Farina*, 625 F.3d at 115. (internal citations omitted). While these are convenient categories for the purpose of analysis, the Supreme Court has cautioned against treating the distinction between

them too rigidly. *Virginia Aluminum, Inc. v. Warren*, 139 S.Ct 1894, 1901 (2019) ("This Court has sometimes used different labels to describe the different ways in which federal statutes may displace state laws—speaking, for example, of express, field, and conflict preemption. But these categories 'are not rigidly distinct'"). Regardless of the classification, the preemption analysis requires a probing examination of the relationship between the federal and state interests implicated in the controversy.

"Federal regulations preempt state laws in the same fashion as congressional statutes." *Id.* (quoting *Fellner v. Tri-Union Seafoods, LLC*, 539 F.3d 237, 243 (3d Cir. 2008) ("Where Congress has delegated the authority to regulate a particular field to an administrative agency, the agency's regulations issued pursuant to that authority have no less preemptive effect than federal statutes, assuming those regulations are a valid exercise of the agency's delegated authority.")). Critical to the analysis of this case "[p]reemption can apply to all forms of state law, including a civil action based on state law. *Farina*, at 115 (citing *Holk v. Snapple Beverage Corp.* 575 F.3d 329, 331 (3d Cir. 2009)). The critical question in this case is whether the process relating to the imposition of tariffs (including objections to a competitor's exclusion request, the ultimate determination of the Secretary of Commerce and any post-determination appeal) precludes the inquiry associated with NLMK's state law cause of action.

1.      **The presumption against preemption does not apply.**

Out of respect for the sovereignty of the states, there is a presumption against preemption. *Farina*, at 116 (citing *Wyeth v. Levine*, 555 U.S. 555, 565, n.3 (2009) ("We rely on the presumption [against preemption] because respect for the States as independent sovereigns in our federal system leads us to assume that Congress does not cavalierly pre-empt state-law causes of action.") (internal citations omitted)). The presumption against preemption will not apply, however, in areas where state regulation has been historically absent. *Farina*, at 116 (citing *Buckman v. Plaintiff's*

*Legal Comm.,* 531 U.S. 341, 347 (2001) (rejecting the presumption for state law fraud claims premised on allegedly fraudulent statements made to the FDA because "the relationship between a federal agency and the entity it regulates . . . originates from, is governed by, and terminates according to federal law.")).   To be clear, "the presence of federal regulations, however longstanding, does not by itself defeat the application of the presumption.  Rather, its application accounts for the historic presence of state law, but does not rely on the absence of federal regulation." *Id.* at 116.  In other words, the presumption against preemption will not be vitiated by a history of federal regulation, alone, but rather, by the absence of a history of state regulation. Nevertheless, in areas where there has been "a history of significant federal presence," it may evidence a corresponding and comparative absence of state regulation. *See United States v. Locke,* 529 U.S. 89, 108 (2000).

While, as NLMK correctly argues, the states have historically regulated unfair and anticompetitive business practices, that is too broad of a characterization of what this case is about. Specifically, this case calls into question a very specific type of conduct—alleged misrepresentations made to Commerce in the determination of whether a tariff should be imposed upon imported goods.  It is difficult for NLMK to prevail on any claim that its cause of action falls within a type of conduct traditionally regulated by the states when it is far from clear that it has even asserted a tenable cause of action under state law.  Moreover, as addressed at length below, the statutory and regulatory framework governing the tariff exclusion process includes an independent national security component that is part of each and every determination.  The states have no history of regulation in the fields of tariffs on foreign goods or national security. Rather, these areas have, from the time the Constitution was ratified, been viewed as inherently federal in nature.

The Supreme Court's decision in *Buckman* is instructive as to the presumption against preemption. There, the plaintiffs brought state law fraud claims against the manufacturer of medical screws alleging that it made fraudulent representations to the Food and Drug Administration (FDA) to obtain regulatory approval for the screws. The plaintiffs argued that "such representations were at least a 'but for' cause of injuries that plaintiffs sustained from the implantation of these devices. Had the representations not been made, the FDA would not have approved the devices, and the plaintiffs would not have been injured." *Buckman*, 531 U.S. at 344. The Supreme Court explored the statutory and regulatory framework for approval of medical devices. It then characterized the essence of plaintiffs' claims as essentially seeking redress for misrepresentations made to federal agencies in the approval process. It concluded:

> Policing fraud against federal agencies is hardly "a field in which the States have traditionally occupied," *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 147 (1947), such as to warrant a presumption against finding federal pre-emption of a state-law cause of action. To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminates according to federal law. Cf. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504-505, 108 S.Ct. 2510, 101 L.Ed.2d 422 (1988) (allowing pre-emption of state law by federal common law where the interests at stake are "uniquely federal" in nature). Here, petitioner's dealings with the FDA were prompted by the MDA, and the very subject matter of petitioner's statements were dictated by that statute's provisions. Accordingly—and in contrast to situations implicating "federalism concerns and the historic primacy of state regulation of matters of health and safety, *Medtronic,* 518 U.S., at 485, 116 S.Ct. 2240—no presumption against pre-emption [applies] in this case.

*Id.* at 347-48.

The conduct complained of by NLMK is substantially similar to that in *Buckman*—alleged misrepresentations made to a federal regulatory agency which were alleged to be a but for cause of the plaintiffs' alleged injuries. Just as the *Buckman* Court rejected any contention that misrepresentations concerning medical devices fall within the scope of the states' traditional

authority over matters of health and safety, so too does the Court reject the contention that the gravamen of this action implicates the authority of the states' (in particular, Pennsylvania) to police unfair business practices.    Rather, the core of NLMK's action is the series of alleged misrepresentations made by U.S. Steel to Commerce.  As in *Buckman*, this Court holds that "[p]olicing fraud against federal agencies is hardly a field in which the States have traditionally occupied."  *Id.* at 347.  This point is highlighted here, where Pennsylvania state law is not clear that the unfair competition cause of action will even apply to misrepresentations made to a government actor about a competitor.  Conversely, there is no question that issues relating to international trade, tariffs and national security have long been the exclusive domain of the federal government, rather than the several states.  Therefore, the Court holds that the presumption against preemption does not apply in this case.

>    **2.    NLMK's claim is preempted by the preeminent federal interests that pervade the tariff exclusion process.**

Having determined that there is no presumption against preemption applicable in this case, the Court must determine whether any of the three classes of preemption apply.  There is no language in either the relevant statute or the regulations that expressly preempt state causes of action relating to conduct in the tariff exemption process.  Express preemption is not, therefore, implicated in this case.  Whether field preemption or conflict preemption applies requires a deeper examination.  Because it is broader in scope, the Court examined field preemption first.  Because it has determined that field preemption applies, it is unnecessary to address conflict preemption.

The Third Circuit has summarized the definition of field preemption as follows:

The doctrine of field preemption applies where "the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation" or where "the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Hillsborough Cnty.*, 471 U.S. at 713, 105 S.Ct. 2371 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230,

67 S.Ct. 1146, 91 L.Ed. 1447 (1947)). "The question whether the regulation of an entire field has been reserved by the Federal Government is, essentially, a question of ascertaining the intent underlying the federal scheme." *Id.* at 714, 105 S.Ct. 2371. With respect to agency regulations, "we must consider whether the regulations evidence a desire to occupy a field completely." *R.J. Reynolds Tobacco Co. v. Durham Cnty.* 479 U.S. 130, 149, 107 S.Ct. 499, 93 L.Ed 2d 449 (1986). "Pre-emption should not be inferred, however, simply because the agency's regulations are comprehensive." *Id.*

*Farina*, 625 F.3d at 121. Field preemption will apply where "the federal regulation is so sweeping that no state law can occupy that field." *Donn v. A.W. Chesterton Co., Inc.*, 842 F. Supp. 2d 803, 807 (E.D. Pa. 2012).

The first task of the Court in determining whether field preemption applies is "ascertaining the intent underlying the federal scheme." *Id.* (citing *Hillsborough Cnty.*, 471 U.S. at 714). "When Congress intends federal law to 'occupy the field' state law in that area is preempted." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000).    The Supreme Court explained:

> For when the question is whether a Federal act overrides a state law, ***the entire scheme of the statute must, of course, be considered,*** and that which needs must be implied is of no less force than that which is expressed. If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power.

*Savage v. Jones*, 225 U.S. 501, 533 (1912) (emphasis added).   The surest indicator of the intent underlying the federal scheme at issue here is the language of the enabling statute itself—19 U.S.C. §1862. *Gov't of Virgin Islands v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993); *see also Pennsylvania Dep't of Pub. Welfare v. Davenport*, 495 U.S. 552, 557–58 (1990); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980)).   First, the statute is entitled "Safeguarding national security."   And this is not an empty title, but rather, it aptly captures a pervasive national security focus underlying each section of the statute. By way of example, the statute provides:

24

**(b) Investigations by Secretary of Commerce to determine effects on national security of imports of articles; consultation with Secretary of Defense and other officials; hearings; assessment of defense requirements; report to President; publication in Federal Register; promulgation of regulations**

(1)(A) Upon request of the head of any department or agency, upon application of an interested party, or upon his own motion, the Secretary of Commerce (hereafter in this section referred to as the "Secretary") shall immediately initiate an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion.

(B) The Secretary shall immediately provide notice to the Secretary of Defense of any investigation initiated under this section.

(2)(A) In the course of any investigation conducted under this subsection, the Secretary shall—

(i) consult with the Secretary of Defense regarding the methodological and policy questions raised in any investigation initiated under paragraph (1),
(ii) seek information and advice from, and consult with, appropriate officers of the United States, and
(iii) if it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation.

19 U.S.C.A. § 1862.  Specifically relevant to the claim in this case, the statute further states:

**(d) Domestic production for national defense; impact of foreign competition on economic welfare of domestic industries**
For the purposes of this section, the Secretary and the President shall, in the light of the requirements of national security and without excluding other relevant factors, give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and the capacity of the United States to meet national security requirements. In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports

25

shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

19 U.S.C.A. § 1862.  Finally, under the interim final rule enacted by the Secretary of Commerce pursuant to the authority conferred by §1862, the Secretary's determination of each and every tariff exclusion request includes an independent national security inquiry:

> The exclusion review criterion "or for specific national security considerations" is intended to allow the U.S. Department of Commerce, in consultation with other parts of the U.S. Government as warranted, to make determinations whether a particular exclusion request should be approved based on specific national security considerations.

15 C.F.R. pt. 705, Supp. 1, ¶¶ (c)(6)(iii).  It is important to highlight that, even if no objection to an exclusion request is lodged, the Secretary will still conduct a national security assessment of the request.  *Id.* at ¶ (h)(2)(ii) ("[If] no objections have been submitted, BIS will immediately assess the request for any national security concerns.").

The statutory and regulatory scheme at issue combines two areas which have traditionally been viewed as presenting uniquely federal interests—the imposition of tariffs on foreign commerce and national security.  The federal preeminence in each of these fields originates in the Constitution itself and has been long recognized by Congress and the courts.

Federal authority over the imposition of tariffs and the regulation of commerce with foreign nations is established by two separate provisions of Article I, § 8:

> The Congress shall have the Power To lay and collect Taxes, Duties, Imposts and Excises…

U.S. Const. Art. I, § 8, cl. 1; and

> To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.

U.S. Const. Art. I, § 8, cl. 3.  These clauses have long been interpreted as conferring broad federal authority inherent in the preeminent role played by the national government with respect to foreign

trade and relations and that this authority was a necessary component of the federal system established in the Constitution. In *Brown v. Maryland*, 25 U.S. 419, 438-39 (1827), Chief Justice John Marshall explained that the bestowal upon Congress of the power to tax foreign commerce corrected a weakness of the Articles of Confederation:

> From the vast inequality between the different States of the confederacy, as to commercial advantages, few subjects were viewed with deeper interest, or excited more irritation, than the manner in which the several States exercised, or seemed disposed to exercise, the power of laying duties on imports. From motives which were deemed sufficient by the statesmen of that day, the general power of taxation, indispensably necessary as it was, and jealous as the States were of any encroachment on it, was so far abridged as to forbid them to touch imports or exports, with the single exception which has ben noticed. Why are they restrained from imposing these duties? ***Plainly, because, in the general opinion, the interest of all would be best promoted by placing that whole subject under the control of Congress***.

(emphasis added). Likewise, the decision to place all authority over foreign commerce in the hands of Congress—to the exclusion of the states—also arose from the weakness of the decentralized approach preceding ratification of the Constitution:

> The oppressed and degraded state of commerce previous to the adoption of the constitution can scarcely be forgotten. It was regulated by foreign nations with a single view to their own interests; and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties; but the inability of the federal government to enforce them had become so apparent as to render that power to a great degree useless. Those who felt the injury arising from this state of things, and those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the federal government, contributed more to that great revolution which introduced the present system, than the deep and general conviction, that commerce ought to be regulated by Congress. It is not, therefore, matter of surprise, that the grant should be as extensive as the mischief, and should comprehend all foreign commerce, and all commerce among the States. To construe the power so as to impair its efficacy, would tend to defeat an object, in the attainment of which the American public took, and justly took, that strong interest which arose from a full conviction of its necessity.

*Brown*, 25 U.S. at 445-46.  More recently, the Supreme Court stated:

> Foreign commerce is pre-eminently a matter of national concern.  In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government with unified and adequate national power. Although the Constitution, Art. I, §8, cl. 3, grants Congress power to regulate commerce "with foreign Nations" and "among the several States" in parallel phrases, there is evidence that the Founders intended the scope of the foreign commerce power to be greater.  Cases of this Court, stressing the need for uniformity in treating with other nations, echo this distinction.

*Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448 (1979) (internal citations omitted).

In general, there is little doubt that the power to regulate international commerce and to impose tariffs on imported goods are powers which have been constitutionally entrusted to the federal government and admit little room for state interference—and even there in only the most collateral of situations.  The Court will examine whether this case presents one of those situations or whether it falls within the broad field of federal interests which will preempt state interference.

The Court's analysis does not stop with foreign trade because the tariffs at issue in this case were not merely revenue-raising measures.  Rather, the plain and pervasive language of the statute expresses Congress's intent in enacting 19 U.S.C. § 1862 was, as it said, to "safeguard [ ] national security."  It did so by vesting the President and the Secretary of Commerce with the authority to, respectively, commission a study of the national security implications of foreign imports, issue a proclamation imposing a tariff, and issue rules providing for an exemption process—including an individualized examination of the national security implications of each exemption request and challenges thereto.  With the congressional purpose of the Statute so clearly expressed, the Court may move on to the next question—whether the federal interest in that purpose is so pervasive as to exclude any state regulation even through an examination of actions occurring in the course of the tariff exclusion process through state law causes of action.

Questions of foreign relations and national security are textually committed by the Constitution to the federal government in a number of places.  To Congress is entrusted the authority "to declare war," "to raise and support Armies," "to provide and maintain a navy," "to make Rules for the Government and Regulation of the land and naval Forces," "to provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions," and "to provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress." U.S. Const. Art. I, § 8, cl. 11-16.  The Constitution vests the President with broad authority relating to national security and foreign relations.  The President is the commander in chief of the armed force, has the authority to appoint and receive ambassadors and can make treaties (with approval by two-thirds of the Senate).  U.S. Const. Art. II.

There is no question that the framers of the Constitution viewed the textual conferral of national security and foreign affairs powers upon the federal government as broad and exclusive. *The Federalist* No. 4 extolled the Constitution's unified front approach to foreign relations and national security as a deterrent against foreign aggression and internal division.  It observed:

> Leave America divided into thirteen or, if you please, into three of four independent governments—what armies could they raise and pay—what fleets cold they ever hope to have? If one was attacked, would the others fly to its succor, and spend their blood and money in its defense?

* * *

> If they [foreign governments] see that our national government is well administered, our trade prudently regulated, our militia properly organized and disciplined, our resources and finances discreetly managed, our credit re-established, our people free, contented, and united, they will be much more disposed to cultivate our friendship than provoke our resentment.

29

*The Federalist* No. 4 (John Jay).  Likewise, *The Federalist* No. 42 reasoned, with respect to foreign

relations:

> The second class of powers, lodged in the general government, consists of those
> which regulate the intercourse with foreign nations, to wit: to make treaties; to send
> and receive ambassadors, other public ministers, and consuls; to define and punish
> piracies and felonies committed on the high seas, and offenses against the law of
> nations; to regulate foreign commerce, including a power to prohibit, after the year
> 1808, the importation of slaves, and to lay an intermediate duty of ten dollars per
> head, as a discouragement to such importations. ***This class of powers forms an
> obvious and essential branch of the federal administration. If we are to be one
> nation in any respect, it clearly ought to be in respect to other nations.*** The powers
> to make treaties and to send and receive ambassadors, speak their own propriety.
> Both of them are comprised in the articles of Confederation, with this difference
> only, that the former is disembarrassed, by the plan of the convention, of an
> exception, under which treaties might be substantially frustrated by regulations of
> the States; and that a power of appointing and receiving "other public ministers and
> consuls," is expressly and very properly added to the former provision concerning
> ambassadors.

*The Federalist* No. 42 (James Madison) (emphasis added).

The Supreme Court has long recognized that foreign relations and national security are

preeminently federal concerns that are exclusive of state regulation.  In *Hines v. Davidowitz*, 312

U.S. 52, 62 (1941), the Supreme Court held that "the supremacy of the national power in the

general field of foreign affairs…is made clear by the Constitution, was pointed out by authors of

*The Federalist* in 1787, and has since been given continuous recognition by this Court."  In finding

a Pennsylvania alien registration statute preempted by the exclusive federal authority to control

alienage and immigration, the Supreme Court related it to the foreign affairs powers of the United

States and explained:

> The Federal Government, representing as it does the collective interests of the forty-
> eight states, is entrusted with full and exclusive responsibility for the conduct of
> affairs with foreign sovereignties.  For local interests the several states of the Union
> exist, but for national purposes, embracing our relations with foreign nations, we
> are but one people, one nation, one power.  Our system of government is such that
> the interest of the cities, counties and states, no less than the interest of the people

of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference.

*Hines*, 312 U.S. at 63.

More recently, the Supreme Court has preempted a number of state laws that cross into the authority over foreign relations textually committed by the Constitution to the federal government. In *Crosby v. National Foreign Trade Council,* 530 U.S. 363 (2000), the Supreme Court held that a Massachusetts statute restricting state agencies from purchasing goods and services from companies doing business with Burma (Myanmar) was preempted by the federal law—specifically, a federal act imposing sanctions on Burma and empowering the President to monitor the situation in that nation and impose further sanctions subject to certain conditions.  In finding preemption, the Supreme Court focused on the preeminence of federal law over foreign relations and national security, explaining:

> This express investiture of the President with statutory authority to act for the United States in imposing sanctions with respect to the Government of Burma, augmented by the flexibility to respond to a change by suspending sanctions in the interest of national security, recalls Justice Jackson's observations in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 96 L.Ed. 1153 (1953): "When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right, plus all that Congress can delegate." See also, *id.* at 635-36 n.2, 72 S.Ct. 863 (noting that the President's power in the area of foreign relations is least restricted by Congress and citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936)). Within the sphere defined by Congress, then, the statute has placed the President in a position with as much discretion to exercise economic leverage against Burma, with an eye toward national security, as our law will admit.  And it is just this plenitude of Executive authority that we think controls the issue of preemption here.  The President has been given this authority not merely to make a political statement but to achieve a political result, and the fullness of his authority shows the importance in the congressional mind of reaching that result.  It is simply implausible that Congress would have gone to such lengths to empower the President if it had been willing to compromise his effectiveness by deference to every provision of state statute or local ordinance that might, if enforced, blunt the consequences of discretionary Presidential action.

31

*Crosby*, 530 U.S. at 375-76.

The federal government's authority over foreign trade, foreign relations and national security is firmly rooted in the plain language of the Constitution and is confirmed by our constitutional history. This authority is among the broadest possessed by the federal government. It is against this backdrop that Congress passed 19 U.S.C. § 1862, which purports, in its very title, to serve the interest of "protecting national security." It specifically empowers the President, the Secretary of Commerce and the Secretary of Defense to explore the impact of foreign imports on the national security of the United States and, if necessary to promulgate a remedy to protect domestic manufacturing when required to protect that interest. After the statutory prescribed study, and using the broad authority conferred by 19 U.S.C. § 1862, President Trump issued Proclamation 9705, which imposed a 25% tariff on imported steel articles (with certain designated exceptions). The Secretary of Commerce used his authority to promulgate rules interpreting and implementing Proclamation 9705 and designating a process for submitting exclusion requests, objections to those requests, and for the adjudication of any such request. Critically, with or without an objection lodged, the Secretary of Commerce was required to make an independent national security inquiry in determining each and every exclusion request. Every step of the process underlying the specific exclusion requests at issue in this case—from the initial exploration of the need for a tariff, to its imposition, to the creation and maintenance of an exemption and objection process, to the Secretary of Commerce's ultimate determination—is an exercise in authority which is overwhelmingly exclusively federal in nature. Each step of the process falls squarely within areas of authority which have long been recognized as belonging to the federal government, and the federal government alone.

NLMK argues that the Court can avoid interfering with areas of exclusive federal authority by limiting its inquiry to the narrow state law cause of action asserted—looking only to U.S. Steel's alleged misrepresentations in the exemption process. The Court disagrees. This position does not account for the fact that each and every exclusion determination included an examination of the national security implications of the request (even without an objection). There is no way for NLMK's state law cause of action to avoid treading on ground that is held exclusively by the federal government. Federal considerations which are framed and regulated by the statute, Proclamation and rules relating to the tariff leave no room for state intrusion into the process.

In a more general sense, the Court holds that the process created by Congress and entrusted to the administrative authority of the President and the Secretary of Commerce to determine whether tariffs are warranted and to examine any exemption requests is so pervaded by issues which are in the exclusive authority of the federal government as to preempt any inquiry by the states—either by affirmative legislation and regulation or by the operation of state law causes of action.[36] Indeed, this case presents a classic instance of field preemption. Congress—through the enactment of 19 U.S.C. § 1862—has created a process dealing with uniquely federal concerns and places all determinations relating to the implementation of and exemption from tariffs firmly within the discretion of federal executive officials. The nature and structure of 19 U.S.C. § 1862

---

[36] The determination that field preemption bars scrutiny into the tariff exemption process does not leave a party, like NLMK, wholly without a means of seeking redress. Rather, as explained above, there is a process where one can challenge Commerce's determinations. This is consistent with the recognition that in many cases where field preemption is found, there will be a substituted federal remedy. See, e.g., *Saleh v Titan Corp.*, 580 F.3d 1, 31 (D.C. Cir. 2009) (Garland, J., dissenting) ("As *Boyle* [*v. United Technologies*, 487 U.S. 500 (1988)] explained "where the federal interest requires a uniform rule, the entire body of state law applicable to the area conflicts [with] and is replaced by federal rules." Accordingly, where the Supreme Court finds field preemption appropriate, it does not simply leave the field vacant. Instead, it substitutes a federal common law regime."). Here, the federal remedy was clearly established and, indeed, NLMK availed itself of it.

and its attendant regulations at issue convey an unmistakable intention, in light of our constitutional history and the plain language of the statute itself, to so thoroughly occupy the field (i.e., the determinations relating to the imposition of and exemption from tariffs imposed thereunder) "as to make reasonable the inference that Congress left no room for the States to supplement it."[37]  *Farina*, at 121 (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)).  This Court will not open the doors of the courthouse to NLMK's Pennsylvania law cause of action which would require the Court to apply state law standards to the exclusively federal considerations encapsulated in the tariff exemption process.  NLMK's state law cause of action is preempted.

---

[37] Not only do the tariff imposition and exemption process established by 19 U.S.C. § 1862, Proclamation 9705 and the Secretary of Commerce's rules present issues which are traditionally left to the authority of the federal government alone, but there is a corresponding absence of any history of state regulation on these topics.  Broadly, as explained above, areas of foreign commerce, foreign relations and national security have not been topics historically regulated by the states.  More narrowly, NLMK cannot identify, and the Court cannot find, a single case where its novel unfair competition claim was applied to communications made to a governmental agency or in the course of some adjudicatory process.  There is no longstanding tradition of state unfair competition law regulating representations made by business competitors to governmental actors—much less in situations relating to foreign trade and national security.

## V.    CONCLUSION

For these reasons, United States Steel Corporation's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) will be granted.  (ECF No. 39).  An Order of Court will follow.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

3/22/2022
Dated

35